Ex Parte Carl Henry BLUE, Applicant.

No. AP–75254.

Court of Criminal Appeals of Texas.

March 7, 2007.

Michael B. Charlton, El Prado, N.M., John E. Wright, Huntsville, TX, for Appellant.

Douglas Howell, III, Asst. D.A., Bryan, Matthews Paul, State's Attorney, Austin, for State.

## *OPINION*

PRICE, J., delivered the opinion of the Court in which MEYERS, JOHNSON, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined.

This is a subsequent application for writ of habeas corpus in a capital case, in which the applicant claims that he cannot be subjected to the death penalty, consistent with *Atkins v. Virginia*,[1] because he is mentally retarded. Although the applicant filed his initial post-conviction application for writ of habeas corpus almost a year *after* the Supreme Court decided *Atkins,* the applicant failed to raise the issue of mental retardation in that initial writ application. He therefore makes no attempt to argue that we have authority to review his claim under Article 11.071, Section 5(a)(1) of the Code of Criminal Procedure.[2]

Instead, the applicant makes two alternative arguments. First, he asserts that we may reach the merits of his claim of mental retardation under Article 11.071, Section (5)(a)(3).[3] Under this provision, a subsequent capital habeas applicant is entitled to a merits-review of a claim if he can show by clear and convincing evidence that, but for a violation of the United States Constitution, "no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071[.]"[4] Alternatively, the applicant asserts that, because the Eighth Amendment prohibition against executing the mentally retarded is absolute, we should suspend all notions of waiver, forfeiture, procedural default, and abuse of the writ, and abandon any otherwise-valid interest the State may have in the finality of the judgment, and permit him to proceed with his claim, notwithstanding whatever statutory impediments exist to his raising the claim in a subsequent writ application. We filed and set this subsequent application to consider whether the

---

1. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

2. TEX.CODE CRIM. PROC. art. 11.071, § 5(a)(1). That provision prohibits consideration of the merits of a claim raised for the first time in a subsequent writ application unless the subsequent application shows that the claim could not have been raised in a previous writ "because the factual or legal basis for the claim was unavailable" at the time the applicant filed his previous writ or writs. We have allowed a number of subsequent capital habeas writ applications raising *Atkins* claims to

proceed under this provision when the applicant's initial writ application was filed *before* the Supreme Court's *Atkins* opinion issued. *See* note 20, *post.* But it is obvious that both the factual and legal bases for Blue's claim of mental retardation were extant at the time he filed his initial writ application, so this provision does not apply in his case.

3. TEX.CODE CRIM. PROC. art. 11.071, § 5(a)(3).

4. *Id.*

applicant should be allowed to proceed on either of these bases.

We hold that, having afforded the applicant one opportunity to raise his *Atkins* claim in a post-conviction setting, the Texas Legislature may legitimately limit any second chance it may afford him to raise it again, notwithstanding the absolute nature of the prohibition against executing the mentally retarded. We conclude that through Article 11.071, Section 5(a)(3), the Legislature has provided a mechanism whereby a subsequent habeas applicant may proceed with an *Atkins* claim if he is able to demonstrate to this Court that there is evidence that could reasonably show, to a level of confidence by clear and convincing evidence, that no rational finder of fact would fail to find he is mentally retarded. However, because we find that the applicant in this case has failed to satisfy this heightened-threshold burden, we deny him leave to proceed.

## I. IS *ATKINS* SUBJECT TO THE ABUSE–OF–THE–WRIT DOCTRINE?

■ The applicant argues that the Eighth Amendment prohibition against executing the mentally retarded is absolute, and for that reason can be raised "at any time." He argues that the *Atkins* bar against executing the mentally retarded amounts to what, in *Marin v. State*,[5] we characterized as an "absolute systemic . . . prohibition."[6] In a different procedural context, the Supreme Court has identified a rule barring execution of the mentally

retarded as one "prohibiting a certain category of punishment for a class of defendants because of their status or offense."[7] To permit the execution of a mentally retarded offender is thus, the applicant argues, "beyond the power of the criminal law-making authority[.]"[8] But we need not reach the question whether *Atkins* has identified a systemic prohibition under *Marin*. For even if we were to agree that "implementation" of such a prohibition "is not optional and cannot, therefore, be waived or forfeited by the parties[,]"[9] this does not necessarily mean, as the applicant contends, that an allegation that the constitutional prohibition applies can be made, literally, "at any time" or that otherwise-legitimate state limitations on post-conviction proceedings must give way to any allegation, however well substantiated, of mental retardation.

■ We did not say in *Marin* that even an absolute requirement or prohibition could necessarily be raised at any time. The question in *Marin* was whether a particular claim, not brought to the trial court's attention, could be raised for the first time on appeal. We observed during the course of our analysis that:

> the right to appeal is not of constitutional magnitude, but is conferred by the Legislature. * * * And that which the Legislature may withhold altogether, it may withhold in part. Thus, our lawmakers may deny the right to appeal entirely or the right to appeal only some things or the right to appeal all things

---

**5.** 851 S.W.2d 275 (Tex.Crim.App.1993).

**6.** *Id.* at 279–280.

**7.** *Penry v. Lynaugh,* 492 U.S. 302, 329–330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *See also Bell v. Cockrell,* 310 F.3d 330, 332 (5th Cir.2002); *Hill v. Anderson,* 300 F.3d 679,

681 (6th Cir.2002); *In re: Holladay,* 331 F.3d 1169, 1172–73 (11th Cir.2003).

**8.** *Penry, supra,* at 329, 109 S.Ct. 2934, *quoting Teague v. Lane,* 489 U.S. 288, 307, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**9.** *Marin, supra,* at 279.

only under some circumstances.[10]

Accordingly, when we came later to describe the nature of absolute requirements and prohibitions, we observed:

> Finally, absolute requirements and prohibitions, like rights which are waivable only, are to be observed even without partisan request. But unlike waivable rights, they can't lawfully be avoided even with partisan consent. Accordingly, any party *entitled to appeal* is authorized to complain that an absolute requirement or prohibition is violated, and the merits of his complaint on appeal are not affected by the existence of a waiver or a forfeiture at trial.[11]

Thus, the proposition that an absolute prohibition may be raised for the first time on appeal is subject to the predicate right to appeal in the first place. The existence of an absolute prohibition, even one that derives from the federal constitution, does not mandate that states create a right to an appellate forum in which to vindicate it.

▪ As is the case with direct appeal, "[s]tates have no obligation to provide" the post-conviction writ of habeas corpus.[12] Of course, Texas law *does* provide for such

writs. But what state law may withhold altogether, it may withhold in part.

▪ Article V, Section 5 of the Texas Constitution provides this Court with authority to entertain post-conviction writs of habeas corpus.[13] Since amendment to this provision in 1977, however, that constitutional authority has been expressly made "[s]ubject to such regulations as may be prescribed by law," which is to say, the Legislature. In 1995, the Legislature exercised that constitutional regulatory authority to promulgate Article 11.071, including the abuse-of-the-writ provisions found in Section 5 of that statute.[14] More than a year later, in *Ex parte Davis*,[15] this Court upheld the validity of the Legislature's exercise of this regulatory authority, and specifically its authority to impose limitations on successive and abusive state post-conviction writs,[16] against an array of constitutional challenges. Thus, subject only to the state constitutional mandate that the writ of habeas corpus "shall never be suspended[,]"[17] it is by now well established that the Legislature may regulate the right to the writ of habeas corpus, and that such regulation legitimately may include imposing limitations on the ability of a post-conviction habeas applicant to file

---

10. *Id.* at 278; *see also Rushing v. State,* 85 S.W.3d 283, 285–86 (Tex.Crim.App.2002).

11. *Id.* at 280 (emphasis added).

12. *Pennsylvania v. Finley,* 481 U.S. 551, 557, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); *Murray v. Giarratano,* 492 U.S. 1, 10, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (plurality opinion); *United States v. MacCollom,* 426 U.S. 317, 323, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976) (plurality opinion). *Cf. Case v. Nebraska,* 381 U.S. 336, 85 S.Ct. 1486, 14 L.Ed.2d 422 (1965) (petition for certiorari granted on issue of whether federal constitution requires states to provide corrective post-conviction process to vindicate federal constitutional rights, but issue essentially rendered moot when Nebraska Legislature enacted legislation to provide same).

13. Tex. Const. art. V, § 5.

14. *See* Acts 1995, 74th Leg., ch. 319, § 1, eff. Sept. 1, 1995.

15. 947 S.W.2d 216 (Tex.Crim.App.1996).

16. A "successive" writ is a subsequent writ that raises issues already raised in an earlier writ application. An "abusive" writ is a subsequent writ that raises issues that were available but not raised in an earlier writ application. *Schlup v. Delo,* 513 U.S. 298, 318 n. 34, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

17. Tex. Const. art. I, § 12. *See also* Tex.Code Crim. Proc. art. 1.08.

multiple writ applications challenging the same capital murder conviction.[18]

▬▬ Accordingly, whether an *Atkins* claim can be recognized for the first time in a *second* post-conviction writ application will depend exclusively upon whether it fits the criteria of Article 11.071, Section 5.[19] For those habeas applicants who filed their initial writs before *Atkins* was decided, this has not been an impediment, so long as they can establish a *prima facie* case for mental retardation.[20] But for an applicant such as Blue, who filed his initial writ application *after Atkins* and nevertheless failed to invoke the absolute constitutional prohibition against executing the mentally retarded in that initial writ, the decision whether to permit him to proceed will be purely a function of whether he can meet one of the other criteria of Article 11.071, Section 5.[21]

Contrary to the applicant's assertion, application of Section 5 does not violate the federal constitution just because it might deny a particular applicant review of an allegation of facts that, if true, might impose a fundamental bar to execution. Indeed, current federal law would deny review on the merits to a similarly situated federal habeas petitioner. The Antiterrorism and Effective Death Penalty Act (AEDPA),[22] does not, at least on its face, permit such a claim to be raised in "a second or successive" *federal* habeas corpus petition.[23] It is unlikely the Supreme

18. Similarly, the United States Supreme Court has held that additional restrictions upon successive or abusive writs imposed by Congress in the Antiterrorism and Effective Death Penalty Act do not amount to a suspension of the writ in violation of Article I, Section 9 of the United States Constitution. *Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996).

19. "We do not have the authority to judicially create a fourth exception to the statute." *Ex parte Graves*, 70 S.W.3d 103, 115 (Tex.Crim. App.2002).

20. *See e.g., Ex parte Briseno*, 135 S.W.3d 1, 3 (Tex.Crim.App.2004) (where initial post-conviction writ of habeas corpus filed pre-*Atkins*, a subsequent writ was allowed to proceed "based upon applicant's *prima facie* showing" of mental retardation); *Ex parte Rodriguez*, 164 S.W.3d 400 (Tex.Crim.App.2005) (same); *Ex parte Staley*, 160 S.W.3d 56, 64 (Tex.Crim. App.2005) ("[A] death-row inmate may file a subsequent writ application based upon the newly available legal claim of mental retardation under *Atkins v. Virginia*, but if his application states that his I.Q. has repeatedly been tested at 120–130, he has failed to state sufficient specific facts establishing a cognizable claim under *Atkins*."). Thus, subsequent applicants who can make the requisite threshold showing have been able to rely upon Article 11.071, Section 5(a)(1) for authority to proceed on the merits.

21. This Court has shown that it can be flexible when it comes to *judicial* doctrines in order to accommodate the constitutional prohibition against executing the mentally retarded. For example, in *Ex parte Soffar*, 143 S.W.3d 804 (Tex.Crim.App.2004), we modified our so-called "two-forums" rule in such a way that it should no longer pose a potential statute of limitations problem for federal habeas applicants raising *Atkins* claims under the provisions of the Antiterrorism and Effective Death Penalty Act. *See In re Hearn*, 376 F.3d 447 (5th Cir.2004); *In re Wilson*, 442 F.3d 872 (5th Cir.2006). But it is one thing to revise a judge-made rule, and quite another to revise a statute. We are ordinarily loathe to "create" law, *Ex parte Briseno, supra*, at 4, and certainly may not create law that overrides the legislative prerogative as expressed in statutory law, absent an identifiable constitutional conflict. In *Davis*, we found no such conflict. Nor has the applicant identified any, other than the "absolute" nature of the bar against executing the mentally retarded. Under these circumstances, "[w]e are not free to judicially disrupt the carefully crafted legislative scheme." *Ex parte Graves, supra*, at 117.

22. Pub.L. No. 104–132, 110 Stat. 1214 (1996).

23. 28 U.S.C. § 2244(b)(2). The Fifth Circuit has allowed *Atkins* claims to proceed in subsequent federal habeas petitions when the ini-

Court would ever hold the federal regime unconstitutional, given its own development, in extensive case law prior to the AEDPA, of rules governing the cognizability in federal habeas corpus of successive, abusive, and defaulted claims.[24] In that case law, the Supreme Court has never identified a constitutional prohibition it regarded as *so* absolute that it would *wholly* nullify the State's otherwise legitimate interest in finality of its judgments upon the mere *allegation* that the prohibition applies.

Before the advent of the AEDPA, the federal doctrine of abuse of the writ was "a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions."[25] The doctrine ultimately evolved into a rule that defined whether a federal habeas petitioner could proceed with a successive or abusive petition along the same lines that the Supreme Court had earlier defined whether a federal court could entertain a claim that had been procedurally defaulted during state proceedings.[26] That is to say, in the federal system, a petitioner would be allowed to proceed to the merits of a claim in a successive or abusive writ if he could demonstrate "cause" for his failure to raise that claim in his prior writ or writs, and "prejudice" that he would suffer should the federal courts decline to entertain it.[27] Alternatively, if he could not demonstrate the requisite "cause and prejudice," the petitioner would still be permitted to proceed with his successive or abusive claim if he could show that "a fundamental miscarriage of justice would result from a failure to entertain the claim."[28]

The Supreme Court has construed "fundamental miscarriage of justice" to mean one of two things: "actual inno-

tial federal petition was filed pre-*Atkins*. In keeping with 28 U.S.C. § 2244(b)(2)(A), the Fifth Circuit has recognized that such otherwise-abusive writs may be brought so long as the petitioner can make a preliminary showing that the claim had not been brought in a previous petition, that it relied upon a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court (*Atkins* ), and that the petitioner could produce evidence to make out a *prima facie* case of mental retardation. *See In re Henderson*, 462 F.3d 413, 415 (5th Cir.2006); *In re Salazar*, 443 F.3d 430, 431 (5th Cir. 2006); *In re Hearn*, 418 F.3d 444, 444–45 (5th Cir.2005); *In re Johnson*, 334 F.3d 403, 404 (5th Cir.2003); *In re Morris*, 328 F.3d 739, 740 (5th Cir.2003). But we presume that, following the plain language of § 2244(b), the Fifth Circuit would *not* permit an identical claim in a subsequent federal petition to proceed if the initial petition was filed *after Atkins*. If the initial petition *already* alleged an *Atkins* claim, the subsequent petition would be barred under § 2244(b)(1), which prohibits raising claims in a subsequent petition that were alleged in a prior petition. If the initial petition *failed* to allege an *Atkins* claim, then such a claim in a subsequent petition would

be barred under § 2244(b)(2)(A), because the *Atkins* claim was not "previously unavailable[.]" And, because § 2244(b)(2)(B) contains no provision comparable to our own Article 11.071, Section 5(a)(3), the federal habeas petitioner would be unable to argue that his *Atkins* claim is cognizable even in a subsequent petition on the basis that it renders him, essentially, innocent of the death penalty.

**24.** *See Felker, supra.*

**25.** *McCleskey v. Zant,* 499 U.S. 467, 489, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Felker, supra.*

**26.** *Id.* at 493–96, 111 S.Ct. 1454.

**27.** *Ibid.* The "cause" aspect of this threshold standard is codified for purposes of "abusive" state habeas corpus writ applications in our Article 11.071, Sections 5(a)(1), (d), and (e).

**28.** *Id.* at 495, 111 S.Ct. 1454. This "fundamental miscarriage of justice" condition for proceeding upon an otherwise-abusive claim is mirrored in our Article 11.071, Subsections 5(a)(2) and (3).

cence,"[29] and "actual innocence of the death penalty."[30] Demonstrating either of these circumstances would act as a gateway, allowing the subsequent federal habeas petitioner to proceed on the merits of his underlying federal constitutional claim. But the Supreme Court has yet to expressly take "actual innocence" beyond this gateway function. It has never definitively acknowledged that a subsequent federal habeas petitioner would be allowed to proceed on a *bare* claim of actual innocence, unaccompanied by some federal constitutional defect in the trial proceedings.[31] The Supreme Court *has* intimated, on more than one occasion, that a federal petitioner attempting to raise such a claim in a successive or abusive writ would have to satisfy an extraordinarily high threshold burden to show his inno-

cence.[32] It has never gone so far even as to *suggest*, however, that a federal petitioner could raise a bare claim of actual innocence of the death penalty in a subsequent federal habeas petition.[33]

"The quintessential miscarriage of justice is the execution of a person who is entirely innocent."[34] And yet, even in that context, the Supreme Court has determined that, before a federal habeas petitioner may proceed on the merits of a successive or abusive petition, he must meet an extraordinarily high threshold burden.[35] Surely it would be worse to execute a man who was unquestionably innocent than it would be to execute a man for whom there is no question he committed a capital crime, but who is mentally retarded. Still, the Supreme

**29.** *See Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *McCleskey, supra*, at 493–96, 111 S.Ct. 1454. In *Schlup v. Delo, supra*, at 327, 115 S.Ct. 851, the Supreme Court solidified the standard for proving "actual innocence" in this context, holding that in order to proceed with a subsequent federal petition under the "fundamental miscarriage of justice" exception, the petitioner must show "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."

**30.** *See Smith v. Murray*, 477 U.S. 527, 537–538, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *McCleskey, supra*, at 493–96, 111 S.Ct. 1454. In *Sawyer v. Whitley*, 505 U.S. 333, 348, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), the Supreme Court defined the standard for proving "actual innocence of the death penalty," holding that in order to proceed with a subsequent federal petition raising a claim of error at the punishment phase of a capital trial, the petitioner must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would have found him eligible for the death penalty under [state] law."

**31.** *See Herrera v. Collins*, 506 U.S. 390, 417–19, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Schlup, supra*, at 314–16, 115 S.Ct. 851;

*House v. Bell*, —— U.S. ——, ———–——, 126 S.Ct. 2064, 2086–87, 165 L.Ed.2d 1 (2006).

**32.** *Herrera, supra*, at 417, 113 S.Ct. 853; *Schlup, supra*, at 315–16, 115 S.Ct. 851; *House, supra*, at 2086–87, 126 S.Ct. 2064.

**33.** In *Schlup v. Delo*, the Supreme Court justified the higher level of confidence required of a showing of "actual innocence of the death penalty" (clear and convincing) than is required for a showing of "actual innocence" (more likely than not), thus: "Claims of actual innocence pose less of a threat to scarce judicial resources and to principles of finality and comity than do claims that focus solely on the erroneous imposition of the death penalty." 513 U.S. at 324, 115 S.Ct. 851. It is possible that the Supreme Court, were it to recognize a bare claim of "actual innocence of the death penalty," would find it appropriate to impose a burden on the petitioner even more "extraordinarily high" than the petitioner who brings a bare claim of actual innocence.

**34.** *Id.* at 324–25, 115 S.Ct. 851.

**35.** *Herrera, supra*, at 417, 113 S.Ct. 853; *Schlup, supra*, at 315–16, 115 S.Ct. 851; *House, supra*, at 2086–87, 126 S.Ct. 2064.

Court would impose a high threshold burden on the petitioner who would wait to show his actual innocence until a subsequent writ application. We do not think the Constitution is more solicitous of the mentally retarded petitioner who files a subsequent petition than it is of the actually innocent petitioner who files a subsequent petition. Thus, we reject any assertion that, because the Eighth Amendment erects an absolute bar to executing the mentally retarded, an applicant must be permitted to proceed with his subsequent writ application upon no more than a bare allegation of mental retardation, whether or not he would be allowed to proceed under the express provisions of Article 11.071, Section 5(a)(3).[36]

We turn next, then, to the question whether, and if so, under what conditions, Article 11.071, Section 5(a)(3) *does* accommodate a claim of mental retardation, raised *for the first time* in a subsequent writ after an initial writ, filed post-*Atkins*, failed to raise it.

**36.** One *federal circuit court of appeals* has recently noted "grave constitutional concerns" in the event that the statute of limitations enacted by the AEDPA were to operate to deny habeas corpus access to an initial federal petitioner who had a claim of actual innocence but who missed his filing deadline. *See* 28 U.S.C. § 2244(d). The Sixth Circuit held that, to avoid these concerns, it would apply the court-made doctrine of equitable tolling, whereby the limitations requirement, which is not considered jurisdictional anyway, would be ignored in any case in which the petitioner could meet the *Schlup* test for actual innocence—that is to say, that it was more likely than not that no reasonable juror would have convicted him. *See Souter v. Jones*, 395 F.3d 577 (6th Cir.2005), and cases cited at 601. Note, however, that the Sixth Circuit did *not* find these "grave constitutional concerns" to justify equitable tolling in the absence of the substantial threshold showing of actual innocence that is embodied in the *Schlup* standard. There is no suggestion that

## II. ARTICLE 11.071, SECTION 5(a)(3)

In its totality, Section 5(a)(3) of Article 11.071 reads:

Sec. 5. (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

\* \* \*

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711.

The Legislature quite obviously intended this provision, at least in some measure, to mimic the federal doctrine of "fundamental miscarriage of justice."

a bare and unsubstantiated claim of actual innocence would suffice to equitably toll the federal statute of limitations. Thus, even if "grave concerns" about the constitutionality of executing a state habeas applicant who was mentally retarded meant that *some* provision must be made to allow him to raise it in a subsequent writ, even if Article 11.071, Section 5 would *not*, we would still require him to satisfy a substantial threshold burden of proof. The "grave constitutional concerns" recognized by the Sixth Circuit do not dictate that we entertain an unsubstantiated claim of mental retardation in a subsequent writ application.

Ultimately, even the applicant seems to acknowledge that *some* threshold proof of mental retardation is appropriate, when he argues that "[i]n the face of an adequate threshold showing that a petitioner is a person who is mentally retarded, the doctrine or application of waiver has no place or purchase." Applicant's Brief, at 20.

■ As we have noted, this federal doctrine operates to excuse procedural default, failure to exhaust, and failure to fully develop the evidentiary basis for a claim in state court, as well as successive or abusive federal writs, thus allowing the federal habeas petitioner to proceed on the merits of his claim where he would otherwise be barred.[37] In the context of capital-punishment proceedings, fundamental miscarriage of justice means "actual innocence of the death penalty."[38] The Supreme Court has limited the application of innocence in this context to constitutional error that affects the habeas petitioner's eligibility for the death penalty under state law. It has expressly rejected the argument that a constitutional error that impacts only the jury's *discretion* whether to *impose* a death sentence upon a defendant who is unquestionably *eligible* for it under state law can be considered sufficiently fundamental as to excuse the failure to raise it timely in prior state and federal proceedings.[39]

Section 5(a)(3) of Article 11.071 represents the Legislature's attempt to codify something very much like this federal doctrine of "actual innocence of the death penalty" for purposes of subsequent state writs.[40] By tying the exception to the general prohibition on subsequent state writs specifically to the statutory special issues in Article 37.071 of the Code of Criminal Procedure,[41] the Legislature apparently intended to codify, more or less, the doctrine found in *Sawyer v. Whitley*.[42]

---

**37.** *See,* respectively: *Murray, supra,* at 496, 109 S.Ct. 2765; *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 11–12, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *McCleskey, supra,* at 495, 111 S.Ct. 1454.

**38.** *Smith, supra,* at 537–38, 106 S.Ct. 2661; *Sawyer, supra,* at 348, 112 S.Ct. 2514.

**39.** *Sawyer, supra,* at 343–48, 112 S.Ct. 2514.

**40.** *Cf. Ex parte Torres,* 943 S.W.2d 469, 473 & n. 3 (Tex.Crim.App.1997) (observing that legislative intent in adopting the comparable provisions of Article 11.07, § 4 of the Code of Criminal Procedure, governing subsequent applications for non-capital post-conviction writs of habeas corpus, and which was promulgated in the same legislative enactment as Article 11.071, Section 5, *see* Acts 1995, 74th Leg., ch. 319, §§ 1 & 5, eff. Sept. 1, 1995, was to adopt abuse-of-the-writ doctrine then current in federal practice); *Ex parte Kerr,* 64 S.W.3d 414, 418 (Tex.Crim.App.2002) (Habeas Corpus Reform Act of 1995 adopted abuse-of-the-writ doctrine currently used in federal court) Our examination of the legislative history of S.B. 440, through which Article 11.071 was originally promulgated, provides no more specific insight than this into the intended scope of the exceptions to the abuse of the writ doctrine as embodied in Section 5.

**41.** Tex.Code Crim. Proc. art. 37.071, §§ 2(b) & (e).

**42.** 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). We hesitate to declare that Article 11.071, Section 5(a)(3) *wholly* codifies the Supreme Court's doctrine of "actual innocence of the death penalty," even inasmuch as it has tied the exception to the bar on subsequent writs to the statutory criteria for the death penalty under Article 37.071. Since 1991, one of the special issues that determine whether capital punishment will be imposed is the so-called "mitigation" special issue, embodied in Article 37.071, Section 2(e). *See* Acts 1991, 72nd Leg., ch. 838, § 1, eff. Sept. 1, 1991. Article 11.071 was originally promulgated in 1995, after this amendment to Article 37.071. *See* Acts 1995, 74th Leg., ch 319, § 1, eff. Sept. 1, 1995. Therefore it is arguable that, in theory at least, a subsequent habeas applicant could demonstrate by clear and convincing evidence that, but for some constitutional error, no rational juror would have answered the mitigation special issue in the State's favor. On its face this would seem to meet the criteria of Article 11.071, Section 5(a)(3). But it would also permit a subsequent state habeas applicant to proceed under circumstances that would not excuse a federal petitioner under *Sawyer v. Whitley*. We need express no ultimate opinion on this question here.

This reading of the exception seems to limit its applicability to constitutional errors that affect the applicant's *eligibility* for the death penalty *under state statutory law.*

But what if it is the constitution itself that prohibits execution, rather than a constitutional error that affects the statutory criteria for eligibility for the death penalty? In other words, what if the applicant is constitutionally ineligible for the death penalty, rather than statutorily ineligible? At least one judge on the United States Fifth Circuit Court of Appeals understands the federal doctrine of fundamental miscarriage of justice to include constitutional as well as statutory ineligibility for the death penalty.[43] The language of Article 11.071, Section 5(a)(3) is broad enough on its face to accommodate an absolute constitutional prohibition against, as well as statutory ineligibility for, the death penalty.

■ A subsequent state habeas applicant may proceed with his claim under Section 5(a)(3) if he can show to the requisite level of confidence that no rational juror "would" have answered at least one of the statutory special punishment issues in the State's favor. Thus, if constitutional error in the case so permeated the State's evidence relevant to one of the special issues upon which it carries the burden of proof that, absent the error, it is practically inconceivable that any rational juror would actually answer the special issues in a way that mandates the death penalty, then the applicant may raise the merits of that error in a subsequent writ application. It is not hard to imagine that errors of this gravity will likely be quite rare—as was, no doubt, the legislative intent.

Far less rare, relatively speaking, will be the capital habeas applicant who is constitutionally ineligible for the death penalty because he is mentally retarded, or was a juvenile at the time of his offense.[44] Upon satisfactory proof at trial that a capital murder defendant is mentally retarded or was a juvenile, no rational juror would answer any of the special issues in the State's favor, if only for the simple reason that the statutory special issues would not be submitted to the jurors in the first place. Because the constitution absolutely prohibits imposing the death penalty upon a mentally retarded or juvenile offender, once it has been definitively shown at trial that the offender was in fact retarded or a juvenile, no jury would even have occasion to answer the statutory special issues. In short, no rational juror would answer the special issues in favor of execution because no rational juror *could,* consistent with the Eighth Amendment.

■ When it fashioned its "actual innocence of the death penalty" doctrine, the Supreme Court had not yet decided that the Eighth Amendment absolutely prohibits the execution of both the mentally retarded and juvenile offenders. Construing Section 5(a)(3) as we do today, to embrace constitutional as well as statutory ineligibility for the death penalty, is both consistent with the plain language of the statute,[45] and at the same time accommodates

---

**43.** *See Moore v. Quarterman,* 454 F.3d 484, 498 (5th Cir.2006) (Dennis, J., dissenting) (defining innocence of the death penalty in terms of ineligibility for the death penalty "because some constitutional or state statutory prerequisite for the imposition of a death sentence could not have been satisfied.") (quoting Randy Hertz & James S. Liebman, FEDERAL HABEAS

CORPUS PRACTICE AND PROCEDURE, § 26.4, at 1369–71 (5th ed.2005)).

**44.** *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

**45.** *Boykin v. State,* 818 S.W.2d 782 (Tex.Crim. App.1991) (in construing statutory language,

the *Atkins* and *Roper* prohibitions. We hold that a state habeas applicant alleging mental retardation for the first time in a subsequent writ application will be allowed to proceed to the merits of his application under the terms of Section 5(a)(3)—at least so long as he alleges and presents, as a part of his subsequent pleading, evidence of a sufficiently clear and convincing character that we could ultimately conclude, to that level of confidence, that no rational factfinder would fail to find he is in fact mentally retarded.[46]

## III. CLEAR AND CONVINCING EVIDENCE

The state habeas applicant who alleges that he is mentally retarded in an initial post-conviction writ application must prove it by a preponderance of the evidence in order to obtain relief on his claim.[47] The subsequent state habeas applicant proceeding under Article 11.071, Section 5(a)(1), who filed an initial writ application before *Atkins*, and thus could not have been expected to raise it initially, must make a *prima facie* showing of mental retardation in his subsequent pleading,

and then, if granted leave to proceed by this Court, must establish in the subsequent proceedings that he is mentally retarded by a preponderance of the evidence.[48] The Legislature has determined, however, that the State's interest in the finality of its judgments justifies the imposition of higher burdens upon the subsequent applicant who did not avail himself of the opportunity and resources available to him at trial or in an initial writ to raise his claim of mental retardation. For the post-*Atkins* applicant who bypassed the opportunity to raise mental retardation at trial or in an initial writ, Section 5(a)(3) mandates that his subsequent application "contain[ ] sufficient specific facts" that, if true, would establish "by clear and convincing evidence" that no rational fact finder would fail to find him mentally retarded.

We do not construe Section 5(a)(3), however, to require that the subsequent applicant must necessarily convince this Court by clear and convincing evidence, *at the threshold*, that no rational factfinder would fail to find he is mentally retarded. Section 5(a)(3) of Article 11.071 does not au-

---

we give effect to plain meaning unless statutory language is ambiguous or would lead to absurd results).

**46.** In *Ex parte Elizondo*, 947 S.W.2d 202, at 209 (Tex.Crim.App.1996), we first articulated the standard for a bare claim of actual innocence in post-conviction habeas proceedings. We held that the applicant must show by clear and convincing evidence that no reasonable juror would have convicted him in light of new evidence of innocence. Section 5(a)(3) of Article 11.071 modifies this actual-innocence standard for purposes of applying it in the death penalty context by requiring the applicant to show that "no rational juror would have answered in the state's favor one or more of the special issues" set out in Article 37.071, Section 2(b). *See* Tex.Code Crim. Proc. art. 37.071, § 2(b). The Texas Legislature has not yet spoken to assign a burden of proof at trial in a capital case on

the issue of mental retardation. *See Ex parte Briseno*, *supra*, at 4–5. In the absence of any express legislative guidance, we assume the burden would be placed upon the defendant to prove mental retardation, rather than upon the State to discount it. That being the case, we think the proper way to articulate a standard for actual innocence of the death penalty predicated on a claim of mental retardation is as we have stated it in the text. That is to say, the applicant in a subsequent writ application who wishes to clear the hurdle of Article 11.071, Section 5(a)(3) must demonstrate to this Court that there is evidence that would be sufficient to show, to a level of confidence by clear and convincing evidence, that *no rational finder of fact would fail to find him mentally retarded.*

**47.** *Ex parte Briseno*, *supra*, at 12.

**48.** *Ibid.*

thorize this Court to grant relief on a subsequent writ application, but only to review the adequacy of the pleading. The statutory scheme as a whole does not call upon us to make a determination of the merits of a subsequent writ application at this juncture.[49] All we can do at this stage of the proceeding is to issue an order, either finding that the requirements under Subsection 5(a)(3) have been met, and the writ should issue and proceed in the ordinary course as an initial writ would, or that the requirements have not been met, and the writ should be dismissed.[50] It would be anomalous to require the applicant to actually *convince* us by clear and convincing evidence at this stage. Indeed, if we were to require that the subsequent application actually *convince* us to that level of confidence, there would be no need to return the application to the convicting court for further proceedings.

Instead, we construe Article 11.071, Section 5(a)(3) to require a *threshold* showing of evidence that would be at least *sufficient* to support an ultimate conclusion, by clear and convincing evidence, that no rational factfinder would fail to find mental retardation. A threshold showing that would allow the finder of fact to conclude no more than that the evidence preponderates in favor of a finding of mental retardation will obviously not suffice at this juncture. But the applicant who can make a threshold presentation of evidence that, if true, would be *sufficient* to show by clear and convincing evidence that no rational factfinder would fail to find him mentally retarded will be allowed to proceed to the merits of his claim in a subsequent writ application.[51] Of course, during the course of those proceedings he must, as a predicate to eventually obtaining habeas corpus relief, present a case for mental retardation that actually *does* convince this Court by clear and convincing evidence that no rational factfinder would fail to find him mentally retarded.

## IV. APPLICATION OF ARTICLE 11.071, SECTION 5(a)(3) TO THE FACTS

 Since *Briseno*, we have essentially defined mental retardation in accordance with the criteria adopted by the American Association on Mental Retardation: 1) significant sub-average general intellectual functioning, usually evidenced by an IQ score below 70, that is accompanied by, 2) related limitations in adaptive functioning, 3) the onset of which occurs prior to the age of 18.[52] In his subsequent writ application, the applicant has proffered some anecdotal evidence from which we could conclude that he does indeed suffer from some adaptive deficits which manifested before he was 18 years old. He offers sketchy grade school records that show that he performed poorly in his academic classes, was socially promoted several times, had to repeat the eighth grade, and eventually left school altogether. But

49. Indeed, on its face, the statutory scheme does not even contemplate that the State should *respond* to a subsequent writ, at least until this Court has authorized the applicant to go forward.

50. *See* Tex.Code Crim. Proc. art. 11.071, §§ 5(c) & 6(b).

51. This is a reasonable construction of the language of the Section 5(a)(3), inasmuch as it expressly requires *"sufficient* specific facts" to establish mental retardation "by clear and convincing evidence[.]" (Emphasis added.) As noted in the text, to construe the statutory language to require that this Court actually *be convinced* by clear and convincing evidence at this juncture of the proceedings would be inconsistent with the balance of the statutory scheme.

52. 135 S.W.3d at 7; *Howard v. State,* 153 S.W.3d 382, 386 (Tex.Crim.App.2004).

the only IQ score alleged comes from the applicant's trial, where an expert testified that, based upon incomplete testing, he estimated the applicant's IQ to fall between 75 and 80. There is no evidence, or even an allegation, that the applicant's poor academic performance was necessarily a product of, or that his apparent adaptive deficits were related to, significantly below average general intellectual functioning. In the absence of such a connection, we cannot say that the applicant has presented threshold evidence sufficient to support a firm belief or conviction that he is mentally retarded. Indeed, the only expert opinion that the applicant offers is that the "paucity of information presented ... makes it impossible to conclude whether [the applicant] is mentally retarded[,]" so that the best the expert can say is that the applicant "might well be mentally retarded and nothing that I have seen is inconsistent with that determination."

## A. School Records

After reviewing the incomplete school records that the applicant has attached to his subsequent writ application, Dr. James R. Patton, Ed.D.,[53] an expert with "29 years of experience working with individuals with mental retardation[,]" summarized the records in his attached "Declaration," and assessed them as follows:

Mr. Blue's school records indicate a number of troubling areas. There is a consistent inability to perform academically. In the fourth grade, he is failing most of his courses and is placed into the fifth grade, having not successfully met the academic grade level expectations of fourth grade. In the fifth

grade, he is placed in remedial classes and there is a notation that he is in Special Education. At the end of the 76–77 school year, he is again placed in the sixth grade, once again having not successfully met the academic grade level expectations of fifth grade. This is indicative of "social promotion," a practice used by some school districts to avoid stigmatizing those students whose learning skills, for whatever reason, were significantly impaired. It was simply recognition that holding these types of students back would accomplish little or nothing; the students were unlikely ever to learn the requisite material to justify academic promotion. These grades continue throughout Mr. Blues's school career; by eighth grade, he is still in remedial classes.

Indeed, the applicant was made to repeat the eighth grade, and apparently dropped out mid-way through his second go-round, failing again, and was accepted into the Job Corps. Dr. Patton's assessment continues:

This inability to achieve in school even modest results is supported by his test results on the California Comprehensive Test of Basic Skills. Like most such tests, the CTBS measures acquired knowledge and cannot be used as a measure of intellectual functioning. Recognizing the intended purposes of the CTBS, one can use the results as an indicator of impaired learning ability that may be attributable to mental retardation. The two years of CTBS scores in 1978 and 1979, when he was 13 and 14 years old, indicate that he was

---

**53.** The Fifth Circuit has found Dr. Patton to be a qualified expert for assessing and diagnosing mental retardation. *In re: Hearn,* 418 F.3d 444, 445–46 (5th Cir.2005). *See also Ex parte Lewis,* 223 S.W.3d 372, 378 (Tex.Crim. App., No. WR–38,355–03, delivered 2006)

(Cochran, J., concurring) (expert witness regarding mental retardation "is not limited to one who is a state-licensed physician or psychologist"); *id.* at 376 (Womack, J., dissenting).

functioning on an acquired knowledge level at the third grade on average. Some levels were as high as the 4th grade, others at the 2nd grade.

That the applicant's academic woes were not necessarily a product of mental retardation is underscored by Dr. Patton's closing observations with respect to the school records:

> Clearly, these deficits in learning ability, may well be attributable to causes other than mental retardation; for example, learning disabilities and/or an impoverished family background may well have played a role, even a determinative one. Mental retardation, however, cannot be ruled out and additional assessment methods should be authorized and employed to determine this.

## B. Adaptive Deficits

The applicant has attached statements from family members, an older friend who grew up around the applicant, and one of applicant's former employers.[54] They provide sketchy, anecdotal evidence and opinions to the effect that the applicant, even from earliest times, was gullible and susceptible to getting into trouble at the instigation of others, could barely read, could not follow any but the simplest instructions, could not manage or even count money, could not fill out job applications on his own, was capable of only the most menial jobs, which he did not hold for long,

and was generally incapable of planning ahead, thinking for himself, or getting by day-to-day without assistance. The applicant does *not* include results from any of the available standardized scales for assessing adaptive deficits.[55]

Dr. Patton concludes that this anecdotal evidence would "support a claim of mental retardation." Conceding once again that "there are other possible explanations for these problems," he asserts that "mental retardation certainly cannot be ruled out and indeed, is strongly suggested by this pattern of adaptive deficits." But, as we have noted, the applicant has produced little to indicate that his adaptive deficits, if any, are related to significantly subaverage general intellectual functioning.

## C. IQ Score

The only evidence of an IQ score is testimony during the applicant's trial from Dr. Windell Dickerson, a defense expert who was called to testify with regard to the issue of future dangerousness. In the course of Dickerson's evaluation of the applicant, he apparently administered "only a few subtests in the Verbal portion of the original WAIS (Weschler Adult Intelligence Scale) test." From that limited testing he extrapolated a full scale IQ of between 75 and 80. In a "Declaration" attached to the applicant's subsequent writ application, Dickerson explains that at the time of trial he did not think it was impor-

---

54. All of these statements are signed, but none is notarized, all merely purporting to be "signed under penalty or perjury...." Indeed, even Dr. Patton's "Declaration" is not notarized.

55. In *Briseno* we recognized that adaptive deficits are "determined by clinical assessment and, usually, standardized scales." 135 S.W.3d at 7, n. 25. One such scale that has been identified in the case law is the Vineland Adaptive Behavior Test. *In re Henderson*, 462 F.3d 413, 416 (5th Cir.2006); *In re: Salazar*,

443 F.3d 430, 433–34 (5th Cir.2006); *United States v. Webster*, 421 F.3d 308, 313 (5th Cir. 2005). *See* AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (Text Revision, 4th ed.2000), at 42. The applicant neither tenders any such test results, nor offers any explanation why he does not, aside from a general complaint about a lack of resources provided under the statute for subsequent applicants in preparing their writ applications—a complaint we address *post*.

tant to administer the full scale test because he "was just trying to get a general sense of [the applicant's] intelligence level" to facilitate his opinion of future dangerousness.[56] Had he been aware of the applicant's school records and adaptive deficits, Dickerson "would have strongly urged trial counsel to utilize a full scale assessment of [the applicant's] intellectual functioning using an instrument reliable for that purpose."

The applicant argues that short form testing such as that which Dickerson utilized is not a reliable measure of IQ. Alternatively, he maintains that because the original WAIS was standardized in 1954, utilizing a phenomenon called the "Flynn Effect,"[57] Dickerson's estimate, if credited at all, ought to be adjusted to reflect an IQ of between 64 and 69. This Court has never specifically addressed the scientific validity of the Flynn Effect. Nor will we attempt to do so now. Rather than try to extrapolate an accurate IQ by applying an unexamined scientific concept to an incomplete test score, we will simply regard the record as it comes to us as devoid of any reliable IQ score. We hold that the only evidence of an IQ score that the applicant has tendered fails to present sufficient specific facts that, even if true, would establish significant sub-average general intellectual functioning by clear and convincing evidence.

### D. Expert Opinion

Dr. Patton (who nowhere in his declaration addresses the applicant's IQ score, or lack thereof) concludes:

Viewed in isolation, none of these factors would be dispositive; taken as an overall pattern, mental retardation is strongly suspected. Only a full and thorough assessment, however, can answer that question.

However, without an IQ score that is indicative of significant sub-average intelligence, the only proof the applicant has offered is his poor school performance, which Patton admits could be the result of other factors. Without more compelling proof, we cannot readily infer that the applicant's apparent adaptive deficits are related to significant sub-average general intellectual functioning. Such evidence, even inasmuch as it may support a strong suspicion, nevertheless falls short of evidence that could reasonably support a firm belief or conviction that the applicant is mentally retarded. Even unchallenged by evidence from the State, the applicant's proof, even if true, is insufficient reasonably to convince us that no rational factfinder would fail to conclude he was mentally retarded to a level of confidence by clear and convincing evidence.

### E. Inadequate Resources

In his brief and during the oral argument of this case, counsel for the applicant complains that to require him to satisfy such a predicate level of confidence is too onerous for the attorneys who are representing death-row inmates in the applicant's position. Both counsel currently representing the applicant in this subsequent writ application are presently court-appointed in federal court, but representing the indigent applicant in this proceeding on a *pro bono* basis.[58] Article 11.071

---

**56.** Dickerson's declaration, like most of the others, is not notarized.

**57.** *See In re: Salazar, supra,* at 433 ("This theory attributes the general rise of I.Q. scores of a population over time to the use of outdated testing procedures, emphasizing the

need for the repeated renormalization of I.Q.-test standard deviations over time.")

**58.** The Fifth Circuit has held that federal habeas counsel are not entitled to federal funds, pursuant to 21 U.S.C. § 848(q)(9), for expert

does not provide for the appointment of counsel, or for investigative or expert funding, for the preparation of subsequent writ applications, as it does for preparation of an initial writ application.[59] Counsel assert that they are not in a financial position to pay for the kind of full and thorough assessment that Dr. Patton has called for. Thus, they cannot fairly be expected to make the clear and convincing demonstration of mental retardation that Article 11.071, Section 5(a)(3) requires as a predicate to proceeding to the merits of the claim in a subsequent writ application.

We are neither unmindful of, nor unsympathetic to, counsel's plight. An attorney who is appointed for the first time to prepare a federal habeas corpus petition and in the course of his investigation develops a good faith suspicion that his client may be mentally retarded will indeed find himself in a dilemma if the initial state habeas attorney has not raised the issue, and the record does not already contain (as it almost invariably will not) evidence sufficient to satisfy the clear and convincing burden imposed by Article 11.071, Section 5(a)(3). We must point out, however, that the attorney who reasonably suspects that his client might be actually innocent, or actually innocent of the death penalty (other than because of mental retardation or juvenile status), will face the same dilemma, *viz:* how to satisfy a steep burden of proof and persuasion without any resources allocated by the State to help his indigent client. That is the hurdle the Legislature has deemed appropriate for the subsequent applicant who has, for whatever reason, bypassed his opportunity

to avail himself of the resources to which he would have been entitled had he raised the issue in an initial writ application, when it was factually and legally available to him.

This means that *pro bono* subsequent writ counsel is put in the unfortunate position of having to choose whether to personally bear the costs of expert and investigative assistance, raise the costs himself from private charitable sources, file a writ application without such assistance that will almost surely fall short of the statutory burden, or file no writ application at all despite his good faith suspicions. This is a regrettable dilemma for any attorney to have to face who is already giving generously and commendably of his own time. But it is one we are not at liberty to solve for him, in light of the legitimate legislative judgment as expressed in the statute. Counsel for the applicant, and others similarly situated, must present their dilemma *for the consideration of the Legislature.*

## V. CONCLUSION

In summary, we hold: 1) that whether the applicant can proceed with his subsequent writ application depends upon whether he can satisfy the criteria of Article 11.071, Section 5(a)(3); 2) that an adequate threshold showing of mental retardation would meet the criteria of that statutory provision; but 3) that the applicant in the instant case has failed to meet his burden to present sufficient specific facts from which, even if true, we could reasonably conclude, by clear and convincing evidence, that no rational factfinder

and investigative assistance to pursue unexhausted claims for purposes of raising those claims in subsequent state post-conviction habeas corpus proceedings. *In re: Joiner,* 58 F.3d 143 (5th Cir.1995); *Sterling v. Scott,* 57 F.3d 451 (5th Cir.1995). *See also Riley v. Dretke,* 362 F.3d 302, 307–308 (5th Cir.2004)

(federal petitioner was not entitled to federal funds to develop unexhausted evidence of mental retardation in support of ineffective assistance of counsel claim).

**59.** Tex.Code Crim. Proc. art. 11.071, §§ 2A & 3.

would fail to find he is mentally retarded. We therefore dismiss his subsequent writ application as an abuse of the writ, as mandated by Article 11.071, Section 5(c).

KELLER, P.J., filed a concurring opinion.

JOHNSON, J., filed a concurring opinion.

WOMACK, J., concurred in the result.

KELLER, P.J., concurring.

The Court holds for the first time today that an applicant may overcome our statutory bar to subsequent writ applications by means of a freestanding claim of actual innocence—in this case, "actual innocence of the death penalty." Because this conclusion is warranted neither by our statute nor by the federal caselaw underlying our statute, I concur in the Court's judgement.

### Language of Article 11.071 § 5

Article 11.071, § 5 prohibits the consideration of a subsequent application unless it meets one of three exceptions.[1] The exception at issue here, sometimes referred to as involving "actual innocence of the death penalty," requires a showing that:

> by clear and convincing evidence, *but for* a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted

to the jury in the applicant's trial under Article 37.071 or 37.0711.[2]

When construing a statute, we give effect to the plain meaning of the text, unless the statutory language is ambiguous or the plain meaning leads to absurd results that the Legislature could not possibly have intended.[3] The "but for" language in the statutory text here means that there must be a causal connection between the constitutional violation and the jury's answers to the punishment special issues. But the constitutional violation announced by *Atkins* occurs only when a mentally retarded person is executed,[4] or phrased another way, only upon the execution of sentence.[5] Since execution of sentence occurs after the jury has given its answers to the special issues, execution of sentence cannot be a cause of those answers.

The Court suggests that causation exists "once it has been definitively shown at trial that the offender was in fact retarded" because then "the statutory special issues would not be submitted to the jurors in the first place."[6] There are several problems with this reasoning.

First, as discussed above, a constitutional violation under *Atkins* does not occur at trial; it occurs at the time a mentally retarded person is *executed.* So it is incorrect to say that a constitutional violation would result in the special issues not being submitted.

Second, even if an *Atkins* violation could occur at trial, none of our cases require that the determination regarding mental

---

1. *See* TEX.CODE CRIM. PROC., Art. 11.071, § 5(a)(1)-(3).

2. Art. 11.071, § 5(a)(3)(emphasis added).

3. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim.App.1991).

4. *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)("the Con-

stitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender").

5. *Id.* at 317, 122 S.Ct. 2242 ("we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences").

6. Court's op. at 161.

retardation be made before the jury delivers its answers to the punishment special issues. In fact, the State is not required as part of its case to disprove mental retardation,[7] and the matter does not have to be submitted to a jury.[8] Even if the mental retardation determination were constitutionally required to be made at trial, nothing prohibits the trial court from considering the question after the punishment verdict, i.e. *after* the jury has answered the special issues.

Finally, and perhaps most importantly, a freestanding *Atkins* claim does not attack the *procedures* for determining mental retardation but advances the *substantive* proposition that the accused is in fact mentally retarded. We are not confronted with a claim that the trial court constitutionally erred in failing to consider mental retardation at trial or in failing to give an instruction on mental retardation to the jury, nor are we confronted with a claim that counsel was ineffective in connection with advancing (or failing to advance) the mental retardation issue. The question here is whether (based in part on evidence gathered *after* trial) the applicant is *actually* mentally retarded. This is a freestanding "actual innocence" (of the death penalty) claim, which logically arises after any jury verdict.[9]

The plain language of Article 11.071 § 5(a)(3) requires showing a constitutional violation that *impacts* the jury's punishment determination. In making a freestanding *Atkins* claim, it might be argued that the jury's punishment determination *is* a constitutional violation. But if the jury's punishment determination is the constitutional violation, then the jury's punishment determination is not being impacted by a constitutional violation. More accurately, however, the constitutional violation in a freestanding *Atkins* claim occurs *after* the jury's punishment determination, which of course means the constitutional violation could not impact or be a cause of that determination.

## Historical Underpinnings

Even if we thought the language of the statute to be ambiguous, the historical backdrop of the statute confirms my construction. In 1992, in *Sawyer v. Whitley,* the United States Supreme Court articulated the federal "actual innocence of the death penalty" exception to the prohibition against subsequent applications: "to show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." [10] Three years later, our Legislature enacted the subsequent application provisions of § 5, containing language that essentially parallels the language in *Sawyer.* The author of our statute, Senator Montford, stated that the newly minted subsequent application scheme, "adopts the abuse of the writ doctrine currently used in *federal practice* which limits an inmate to a one time application for writ of habeas corpus except, and I want to emphasize except, in exceptional circum-

---

7. *Ex parte Briseno,* 135 S.W.3d 1, 10 (Tex. Crim.App.2004).

8. *Escamilla v. State,* 143 S.W.3d 814, 828 (Tex.Crim.App.2004), *cert. denied,* 544 U.S. 950, 125 S.Ct. 1697, 161 L.Ed.2d 528 (2005).

9. *See,* for example, *Ex parte Elizondo,* 947 S.W.2d 202 (Tex.Crim.App.1996). If this type of claim were made at trial or on appeal, it would not be an "actual innocence" claim; it would be a challenge to the sufficiency of the evidence.

10. 505 U.S. 333, 336, 112 S.Ct. 2514 (1992).

stances." [11] Given the legislative history, the parallel language is clearly no mere coincidence. The statutory provision at issue was obviously modeled after the standard articulated in *Sawyer.*

About six months after *Sawyer,* the Supreme Court decided *Herrera v. Collins,* where it made clear that *freestanding* claims of actual innocence do not fall within the "actual innocence" exceptions to the prohibition in the federal system against subsequent applications:

> This is not to say that our habeas jurisprudence casts a blind eye toward innocence. In a series of cases culminating in *Sawyer v. Whitley,* decided last Term, we have held that a petitioner otherwise subject to defenses of abusive or successive use of the writ may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence. This rule, or fundamental miscarriage of justice exception, is grounded in the "equitable discretion" of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons. But this body of our habeas jurisprudence makes clear that a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.

> Petitioner in this case is simply not entitled to habeas relief based on the reasoning of this line of cases. For he does not seek *excusal of a procedural error* so that he may bring an independent constitutional claim challenging his conviction or sentence, but rather argues that he is entitled to habeas relief because

newly discovered evidence shows that his conviction is factually incorrect. The fundamental miscarriage of justice exception is available "only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence." We have never held that it extends to freestanding claims of actual innocence. Therefore, the exception is inapplicable here.[12]

*Herrera* was decided a little more than two years before the Texas scheme was enacted. Given the Legislature's obvious awareness of *Sawyer,* we should conclude that the Legislature was also aware of *Herrera's* explanation of the *Sawyer* standard, when it chose to model the provision at issue upon that standard.

### Conclusion

Since *Herrera,* it is clear that a claim like applicant's would be barred under Supreme Court caselaw. And, as the Court notes, applicant's claim would now be barred in federal court under 28 U.S.C. § 2244(b). In crafting the "actual innocence of the death penalty" exception to the general prohibition against subsequent applications, our Legislature chose to draw a standard based upon Supreme Court caselaw, and that standard simply does not embrace the claim made in this case.

I concur in the Court's decision to dismiss the application, but I do not join its opinion.

JOHNSON, J., concurring.

The United States Supreme Court has, unfortunately, inserted into the legal lexicon the phrase "actual innocence of the death penalty." The meaning of the

---

**11.** *Ex parte Torres,* 943 S.W.2d 469, 473 (Tex.Crim.App.1997)(quoting Senate floor debate, S.B. 440, April 19, 1995, Tape 1, Side 2)(emphasis in *Torres* ).

**12.** *Herrera,* 506 U.S. 390, 404–405, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)(emphasis in *Herrera* ) (citations omitted).

phrase is more properly expressed as "ineligibility for the death penalty" because it has nothing whatsoever to do with a claim of actual innocence, that is, that the claimant did not commit the charged offense. In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court held that it violates the United States Constitution to execute mentally retarded persons, saying that "the mentally retarded should be categorically excluded from execution." *Atkins* at 318, 122 S.Ct. 2242. Translated from the English, "categorically excluded" means "cannot be sentenced to," which means "is ineligible for."

The violation addressed in *Atkins* was based on the Eighth Amendment prohibition against cruel and unusual punishment, specifically, "that death is not a suitable punishment for a mentally retarded criminal.... Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction of the State's power to take the life' of a mentally retarded offender." *Id.* at 521, 122 S.Ct. 2242. A violation occurs when a death sentence is assessed against a mentally retarded defendant or, perhaps even earlier, when the state chooses to seek such a death sentence.

Determination of a defendant's mental abilities are easily ascertained before trial, just as we have done for decades in regard to mental illness and competence to stand trial. If a defendant is, in fact, mentally retarded, *Atkins* removes the death penalty from the universe of possible punishments. If death is not a possi-

ble punishment, the special issues will never be submitted to the jury, just as they are not submitted when the state chooses not to seek a death sentence for capital murder. If the issues are not submitted, "no rational jurors would have answered in the state's favor one or more of the special issues...." If the jury does not answer the special issues in the state's favor, the only option is a mandatory life sentence, a result which the Supreme Court did not in any way forbid or limit.

I do not believe that *Atkins* should, or even can, be read to say that the state may sentence mentally retarded persons to death but is prohibited from carrying out that sentence. If we apply that logic outside of the context of capital punishment, the state would be permitted to sentence a retarded defendant to prison but could not incarcerate him. If we were considering such a case under *Boykin*,[1] we would undoubtably find that such a reading "would lead to absurd consequences that the Legislature could not *possibly* have intended...." *Boykin* at 785 (emphasis in original).

If the state may sentence a defendant to death, but may not execute him, then the sentence of death has been commuted, by operation of law, to life in prison. If the only possible punishment is a life sentence, the cause ceases to be a capital case,[2] and death row is not an option. Let us then be forthright and honest about the actual sentence and call it what it is—life in prison—a sentence served in the general population.

I join the opinion of the Court.

---

1. *Boykin v. State*, 818 S.W.2d 782 (Tex.Crim. App.1991).

2. *See, Sisk v. State*, 131 S.W.3d 492, 497 (Tex. Crim.App.2004)("We hold that the term 'a capital case'... means a case in which a convicted person was sentenced to death.").