WR-68,348-03
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/16/2015 5:43:00 PM
Accepted 1/20/2015 9:21:51 AM
ABEL ACOSTA
CLERK

## NO. WR-68,348-03

RECEIVED
COURT OF CRIMINAL APPEALS
1/20/2015
ABEL ACOSTA, CLERK

## IN THE
## TEXAS COURT OF CRIMINAL APPEALS

### EX PARTE JUAN LIZCANO,

### APPLICANT

## BRIEF IN SUPPORT OF
## POST CONVICTION WRIT OF HABEAS CORPUS
## (ART. 11.07, V.A.C.C.P.)

**From the 282nd District Court, Dallas County, Texas,
Cause No. W05-59563-S(A), Hon. Andy Chatham, presiding.**

Debbie McComas
State Bar No. 00794261
*Debbie.McComas@haynesboone.com*
Stephanie Sivinski
State Bar No. 24075080
*Stephanie.Sivinski@haynesboone.com*
HAYNES & BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, Texas 75219
Telephone: 214-651-5000
Telecopier: 214-651-5940

Alma Lagarda
State Bar No. 24755810
*alagarda@texasdefender.org*
TEXAS DEFENDER SERVICE
510 S. Congress, Suite 304
Austin, TX 78704
Telephone: 512-320-8300
Telecopier: 512-477-2153

**ATTORNEYS FOR APPLICANT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................4

I.      The trial court erred in finding Mr. Lizcano's *Atkins* claim procedurally and factually barred despite new law and evidence establishing mental retardation. .......................................................................4

II.     *Hall v. Florida* mandates the application of clinical standards for determining intellectual disability. ..........................................................7

III.   *Hall v. Florida* presents a change in the law that renders the legal basis for Mr. Lizcano's *Atkins* claim newly available............................9

IV.   Previous litigation of Mr. Lizcano's intellectual disability was not informed by any diagnostic framework, in contravention of *Hall*. ......................................................................................................14

V.    After *Hall,* clinical standards for establishing intellectual disability should apply in Texas and Mr. Lizcano should be granted relief on his *Atkins* claim. ...................................................19

CONCLUSION .................................................................................................26

CERTIFICATE OF SERVICE .........................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ex Parte Acosta*,
    672 S.W.2d 470 (Tex. Crim. App.1984) ............................................................4

*Atkins v. Virginia*,
    536 U.S. 304 (2002).................................................................................2, 6, 15

*Ex parte Blue*,
    230 S.W. 3d 151 (Tex. Crim. App. 2007) .........................................................5

*Ex Parte Briseno*,
    135 S.W.3d at 7.................................................................................................15

*Ex parte Briseño*,
    No. AP-76,132, 2010 WL 2332150 (Tex. Crim. App. June 9, 2010)
    (not designated for publication)........................................................................12

*Ex Parte Cathey*,
    No. WR-55,161-02, 2014 WL 5639162 (Tex. Crim. App. Nov. 5,
    2014) .................................................................................................................25

*Ex parte Drake*,
    883 S.W.2d 213 (Tex. Crim. App. 1994) .........................................................10

*Hall v. Florida*,
    134 S.Ct. 1986, --- U.S. --- (2014) (slip op. attached)........................1, 3, 7, 8, 28

*Hall v. State*,
    160 S.W.3d 24 (2004).........................................................................................5

*Ex parte Hood*,
    304 S.W.3d 397 (Tex. Crim. App. 2010) .........................................................12

*Lizcano v. State*,
    No. AP-75,879, 2010 WL 181772 (Tex. Crim. App. May 5, 2010) ............15, 16

*Lizcano v. State*,
  No. AP-75,879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010)
  ...................................................................................16, 17, 18, 19, 20

*Ex parte Martinez*,
  233 S.W.3d 319 (Tex. Crim. App. 2007) ...................................................12, 13

*Ex parte Moreno*,
  245 S.W.3d 419 (Tex. Crim. App. 2008) ........................................................13

*Ex parte Reynoso*,
  257 S.W.3d 715 (Tex. Crim. App. 2008) ........................................................10

*Ex Parte Schuessler*,
  846 S.W.2d 850 (Tex. Crim. App.1993) ...........................................................4

*Ex parte Stuart*,
  653 S.W.2d 13 (Tex. Crim. App. 1983) ..........................................................11

*Ex parte Torres*,
  943 S.W.2d 469 (Tex. Crim. App. 1997) ...........................................................4

*Ex parte Woods*,
  296 S.W.3d 587 (Tex. Crim. App. 2009) .......................................................6, 7

## Other Authorities

James W. Ellis, *Mental Retardation and the Death Penalty: A Guide
  to State Legislative Issues* ............................................................................19

John H. Blume, Sheri Johnson, & Christopher W. Seeds, *Of Atkins
  and Men: Deviations from Clinical Definitions of Mental
  Retardation in Death Penalty Cases*, 18 Cornell J. L. & Pub. Pol'y
  689, 705 (2009) ............................................................................................18

Mental & Physical Disability L. Rep. 11, 9 n. 25 (2003) ........................................19

Applicant, Juan Lizcano, respectfully submits this brief in support of his post-conviction writ of habeas corpus for the specific purpose of bringing to the Court's attention (1) the United States Supreme Court's decision in *Hall v. Florida*, 134 S.Ct. 1986, --- U.S. --- (2014) (slip op. attached) and its effect on this Court's analysis of Mr. Lizcano's *Atkins* claim and (2) the trial court's legal error in refusing to consider the evidence presented in the habeas proceeding and its impact on Lizcano's claims. In the absence of finding that Mr. Lizcano is intellectually disabled and therefore ineligible for the death penalty, counsel for Mr. Lizcano respectfully request that this Court remand his case to the trial court for consideration of the impact of *Hall* on his *Atkins* claim, or, in the alternative, make a determination as to whether *Hall* constitutes new law.

## INTRODUCTION

Notwithstanding:

(1)     Recent direction from the Supreme Court in *Hall* that a determination of intellectual disability[1] must be "informed by the medical community's diagnostic framework,"

---

[1] When Mr. Lizcano's application for habeas corpus was filed in 2009, "mental retardation" was the term commonly used term by the American Association on Mental Retardation (AAMR) and the psychological community at large, to describe the disability. In 2010, the AAMR—now the American Association on Intellectual and Developmental Disabilities (AAIDD)—published the 11th edition of its manual on mental retardation and began using the term "intellectual disability" instead of mental retardation, in part to reflect the changed construct of disability and to align better with professional practices. *See* AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports xvi (11th ed. 2010) (hereinafter, 2010 AAIDD Manual). For purposes of diagnosis, "intellectual disability" covers the same population of individuals who were diagnosed previously with mental retardation, and every individual who is or was eligible for a diagnosis of mental retardation is eligible for a diagnosis of intellectual disability. *Id.* Consistent with this change in terminology by the medical community, the Supreme Court in *Hall* replaced the term

1

(2)     a three-Justice dissent in Mr. Lizcano's direct appeal noting the absence of that medical diagnostic framework in the jury's determination of no intellectual disability at trial, and

(3)     undisputed evidence that Mr. Lizcano is intellectually disabled under the medical diagnostic standards, as confirmed by every mental health professional to test Juan Lizcano's intellectual functioning,

the trial court recommended that relief be denied on Mr. Lizcano's *Atkins* claim.

On April 25, 2014, the trial court heard oral argument on Mr. Lizcano's Proposed Findings of Facts and Conclusions of Law.  At that hearing, counsel for Mr. Lizcano informed the Court of the anticipated Supreme Court opinion in *Hall* and the potential effect it could have on Mr. Lizcano's case.  After *Hall* was decided but before the trial court entered findings of fact and conclusions of law, Mr. Lizcano requested an opportunity to present briefing on the impact of *Hall* on Mr. Lizcano's *Atkins* claim.  See *Notice of Additional Authority and Motion to Present Further Briefing* (filed May 28, 2014) (7 CR:2012).

Without ruling on the motion or otherwise addressing the impact of *Hall* on Mr. Lizcano's *Atkins* claim, the trial court entered findings on June 18, 2014 and recommended that relief be denied.[2]  Specifically, the trial court found that Mr.

---

"mental retardation" with the term "intellectual disability" to describe those individuals with such low intellectual functioning that they cannot be executed under *Atkins v. Virginia*, 536 U.S. 304 (2002).

[2] While not the subject matter of this Motion, the trial court's recommendations with respect to mental retardation are also problematic for reasons that have been fully briefed and are part of the habeas record before this Court.  *See Applicant's Response to State's Proposed Findings of*

2

Lizcano's *Atkins* claim was procedurally barred because he presented evidence of mental retardation at trial and subsequently challenged the sufficiency of the evidence to support the jury's finding that he was not mentally retarded on direct appeal. *See Findings of Fact and Conclusions of Law*, at ¶¶261-269 (filed June 18, 2014) (8CR: 2141-43). The trial court found, in the alternative, that Mr. Lizcano is not mentally retarded. *Id*. at ¶¶270-287 (8CR:2143-46). Finally, the trial court found that this Court has not decided to apply relief retroactively after a subsequent change in the law. *Id*. at ¶266 (8CR:2142).

Adhering to the medical diagnostic criteria for establishing intellectual disability as instructed by *Hall*, Mr. Lizcano is intellectually disabled and the "Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability." *Hall*, 134 S.Ct. at \*1990 (citing *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242 (2002)). As articulated in more detail below, Mr. Lizcano urges the Court to disregard the trial court's recommended findings and find that Mr. Lizcano is intellectually disabled and cannot be put to death.[3] In the absence of doing so, Mr. Lizcano respectfully requests that this

---

*Fact and Conclusions of Law* (filed September 3, 2013) (7 CR:1847). (The trial court adopted verbatim the State's proposed findings of fact and conclusions of law.) In short, the trial court's findings (1) rely on the unscientific testimony of Dr. Price; (2) ignore new evidence of adaptive deficits presented at the writ hearing; and (3) hold that risk factors—namely, evidence of mental retardation in the extended family—have no bearing on applicant's risk for mental retardation, contrary to the AAIDD's clinical definition of mental retardation.

[3] Intellectual disability is not the sole basis supporting Mr. Lizcano's habeas petition. Indeed, Mr. Lizcano's constitutional rights were also violated by, *inter alia*, the prosecution's presentment of

Court remand his case to the trial court for consideration of the impact of *Hall* on his *Atkins* claim, or, in the alternative, determine whether *Hall* constitutes new law.

## ARGUMENT

The trial court's proposed findings essentially punt on Mr. Lizcano's *Atkins* claim because an *Atkins* claim was raised on direct appeal. This was error in light of the new law established in *Hall* and the new evidence presented during the habeas proceeding.

**I.      The trial court erred in finding Mr. Lizcano's *Atkins* claim procedurally and factually barred despite new law and evidence establishing mental retardation.**

Although an applicant is generally barred from raising the same claim on habeas that it raised on direct appeal,[4] this rule does not bar claims based on new law and evidence not available to a defendant in his original case. *See, e.g., Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Indeed, this Court has held that the constitutional bar to the execution of persons with mental retardation requires a reviewing court to consider all available evidence of mental retardation regardless of whether it was presented in previous proceedings addressing that issue.

---

untruthful testimony. These grounds have been fully briefed in the trial court and are part of the habeas record before this Court. Mr. Lizcano raises separately the issue of his intellectual disability because, although the *Hall* decision was brought to the trial court's attention before entry of his recommended findings, the trial court did not allow further briefing on the issue and did not address *Hall* in the recommended findings.

[4] *See Ex Parte Acosta,* 672 S.W.2d 470, 472 (Tex. Crim. App.1984); *see also Ex Parte Schuessler*, 846 S.W.2d 850, 852 n6 (Tex. Crim. App.1993)

For instance, in *Hall v. State*, 160 S.W.3d 24 (2004), this Court was presented with the same evidence of mental retardation that had been previously presented in the defendant's habeas corpus proceedings. In that instance, this Court explained that it was duty-bound to consider *all* relevant evidence before it in resolving the merits of the claim:

> [W]e address appellant's mental retardation in light of both the direct appeal and the habeas records. In this vein, we reject any notion that the direct appeal record in this case must be viewed in isolation. The additional, habeas evidence is before us; taking it into account is necessary for a complete and accurate view of appellant's intellectual capabilities.

*Id.* at 38.

In *Ex parte Blue*, "the applicant filed his initial post-conviction application for writ of habeas corpus almost a year *after* the Supreme Court decided *Atkins,* the applicant failed to raise the issue of mental retardation in that initial writ application." 230 S.W.3d 151, 153 (Tex. Crim. App. 2007). Nonetheless, Blue urged this Court to "reach the merits of his claim of mental retardation under Article 11.071, Section (5)(a)(3)." *Id.* This Court held that, despite the availability of Blue's claim when he filed his initial application:

> through Article 11.071, Section 5(a)(3), the Legislature has provided a mechanism whereby a subsequent habeas applicant may proceed with an *Atkins* claim if he is able to demonstrate to this Court that there is evidence that could reasonably show, to a level of confidence by clear and convincing evidence, that no rational finder of fact would fail to find he is mentally retarded.

*Id*. at 154. This Court went on to explain that the "language of Article 11.071, Section 5(a)(3) is broad enough on its face to accommodate an absolute constitutional prohibition against, as well as statutory ineligibility for, the death penalty." *Id*. at 161. Thus, a Texas applicant can use the § 5(a)(3) gateway to obtain merits review of a death-ineligibility claim, regardless of whether the claim was presented in a prior proceeding—in *Blue*, a prior habeas proceeding, in this case, at trial and on direct appeal.

In fact, following *Blue*, this Court has held that applicants may use § 5(a)(3) to re-litigate the *same* constitutional ineligibility claim rejected *on the merits* in a prior proceeding. Thus in *Ex parte Woods*, this Court allowed the applicant, pursuant to § 5(a)(3), to litigate the *same Atkins* claim he had litigated three years earlier: "Applicant's execution date was set for October 23, 2008. Just two days before this scheduled execution, applicant filed this successive habeas corpus application presenting the same *Atkins* claim that this Court had rejected on the merits more than three years before." 296 S.W.3d 587, 605 (Tex. Crim. App. 2009) (adjudicating the claim on the merits). Under § 5(a)(3), whether the claim was previously available—even if it was previously raised and rejected—is of no importance:

> The issue then is whether, considering the prior evidence and findings, applicant's additional evidence reasonably shows, by clear and convincing evidence, that no rational finder of fact would fail to find that he is mentally retarded. Stated another way, the issue is whether a

6

> rational finder of fact could still find that applicant is not mentally retarded based on the prior evidence and the additional evidence set out in applicant's successive habeas corpus application

*Ex parte Woods*, 296 S.W.3d 587, 606 (Tex. Crim. App. 2009) (citing *Ex parte Blue*).

It would make no sense to apply a more circumscribed merits treatment here, on review of Mr. Lizcano's initial habeas petition, than he would be given, pursuant to *Woods* and *Blue*, if he were to bring this claim anew in a subsequent writ. Logic dictates that, at the very least, in concert with this line of authority, this Court should address the merits of his mental retardation claim in light of *all* evidence presented at trial and in habeas proceedings.

Here, Lizcano's *Atkins* claim on habeas arises from new law (*see Hall*) and new evidence that was not before this Court when it considered the issue on direct appeal. Accordingly, the resolution of the trial-based mental retardation claim on direct appeal cannot be grounds for defaulting the newly-developed mental retardation claim, and the trial court erred in applying such a procedural default.

**II.    *Hall v. Florida* mandates the application of clinical standards for determining intellectual disability.**

In the final days of its most recent term, the Supreme Court decided *Hall v. Florida,* 134 S.Ct. 1986, --- U.S. --- (2014). In *Hall*, the Supreme Court held that Florida's rigid cut off of a 70 IQ for determination of intellectual disability "creates an unacceptable risk that persons with intellectual disability will be executed, and

thus is unconstitutional." *Hall*, 134 S.Ct. at *1990. Although the *Hall* case focused on the first prong of the test for intellectual disability – the IQ score – and it is undisputed in this case that Mr. Lizcano's IQ falls well below the threshold standards for establishing intellectual disability, *Hall's* emphasis on medically acceptable standards in defining intellectual disability is instructive in this case.

Specifically, in rejecting Florida's rigid approach, the Supreme Court relied heavily on the medical community's findings and instructed: "In determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions." *Hall*, 134 S.Ct. at *1993. But in the end, *Hall* went much further than simply consulting the medical community's standards; it required Florida to follow those standards, explaining as follows:

> The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.

*Id*. at *2000. The Court went on to find that "[b]y failing to take into account the standard error of measurement" in IQ testing, as recognized by the medical community, "Florida's law not only contradicts the test's own design but also bars an essential part of a sentencing court's inquiry in adaptive functioning." *Id*. at

8

2001. This statement is no less true when applying the second prong of the test governing intellectual disability – adaptive deficits.

**III.** ***Hall v. Florida* presents a change in the law that renders the legal basis for Mr. Lizcano's *Atkins* claim newly available.**

Mr. Lizcano maintains that, although premised on the same issue presented at trial and on direct appeal—that Mr. Lizcano is intellectually disabled and thus is ineligible for the death penalty—the *Atkins* claim raised on habeas corpus is supported by new evidence that was not discovered before Mr. Lizcano's capital trial. In contrast to the evidence of adaptive deficits presented at trial which focused primarily on Mr. Lizcano's functioning as an adult living in Dallas, Texas, undersigned counsel discovered and presented at the evidentiary hearing substantial new evidence of adaptive deficits that manifested during his early childhood and adolescence in Mexico.[5] Additionally, undersigned counsel discovered and presented evidence of mental retardation and cognitive impairments among several members of Mr. Lizcano's paternal family residing in Mexico, a significant risk factor for mental retardation.

---

[5] The testimony of six witnesses who were available to testify at the evidentiary hearing was submitted by affidavit at the trial court's request. After reviewing their affidavits, counsel for the State were given the opportunity but chose not to cross-examine any of the witnesses, who remained for the duration of the hearing. The trial court did not address any of these affidavits in its findings of fact and conclusions of law.

Taken together, the new evidence presented in state habeas proceedings renders Mr. Lizcano's *Atkins* claim new, because the evidence presented at this juncture is of an entirely different character than what the jury heard during his capital trial. Because the jury did not have before it the new evidence described above, this Court should not give deference to the trial court's recommended findings that the claim is procedurally barred because it was presented at trial and raised and rejected on direct appeal, and the Court should grant relief on Mr. Lizcano's *Atkins* claim based on the evidence presented at the writ hearing.[6]

Notwithstanding the above, previous litigation of an issue does not necessarily bar its reconsideration on state habeas. While it is generally true that claims that were raised on direct appeal are not cognizable on habeas corpus, *Ex parte Reynoso*, 257 S.W.3d 715, 723 (Tex. Crim. App. 2008), previously litigated issues are subject to collateral attack where a prior judgment has been rendered void, or where this Court has decided to apply relief retroactively after a subsequent change in the law. *Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994) (citing *Ex parte Schuessler*, 846 S.W.2d 850 (Tex. Crim. App. 1993) (holding, in part, that writ of habeas corpus could be used to collaterally attack a

---

[6] Trial counsel's failure to discover critical evidence related to his intellectual disability is separately alleged as an IAC claim in Mr. Lizcano's habeas application and was further developed at the writ hearing. Regardless of whether this Court agrees that Mr. Lizcano's *Atkins* claim is procedurally barred, it must nonetheless consider the additional evidence of intellectual disability for purposes of assessing prejudice on his IAC claim, an analysis that—at least with respect to new evidence of adaptive deficits—the trial court did not undertake.

previous decision and granting relief because original conviction was subsequently held to be void) and *Ex parte Stuart*, 653 S.W.2d 13, 15 (Tex. Crim. App. 1983) (granting post-conviction habeas relief after rejecting similar claims on discretionary review and collateral attack).

Although the cases above primarily involved a subsequent change in state law, this Court has also relied on Supreme Court precedent in deciding to consider a claim on state habeas that had been previously raised and rejected on direct appeal. *See Stuart*, 653 S.W.2d at 14 ("In light of recent decisions of this Court *and the United States Supreme Court*, we will examine the merits of this post-conviction habeas corpus application.") (emphasis added). It is therefore conceivable that the sufficiency of the evidence claim raised and rejected on direct appeal—and which the trial court found rendered Mr. Lizcano's *Atkins* claim on state habeas procedurally barred—could be reviewed collaterally in these proceedings based on the Supreme Court's decision in *Hall v. Florida*.[7]

---

[7] Mr. Lizcano did not raise a sufficiency of the evidence claim on state habeas and does not concede that his *Atkins* claim is subject to a procedural bar. He puts forth this argument only because the trial court determined that he is "essentially challenging the sufficiency of the evidence supporting the jury's rejection of the mental retardation special issue," *see Findings of Fact and Conclusions of Law*, at ¶¶262 (filed June 18, 2014) (8CR:2142), and used that finding to procedurally bar his *Atkins* claim.

Similarly, this Court has considered the merits of numerous *Penry* claims raised in subsequent applications because of new law announced by the Supreme Court, where those *Penry* claims would have otherwise been procedurally barred under Article 11.071, Section 5. In *Ex parte Hood*, this Court held that because five Supreme Court decisions regarding Texas' nullification instructions decided after applicant filed his second habeas application announced new law directly relevant to applicant's *Penry* claim, applicant's second subsequent habeas application should not have been procedurally barred. *Ex parte Hood*, 304 S.W.3d 397, 398-99 (Tex. Crim. App. 2010). *See also, Ex parte Briseño*, No. AP-76,132, 2010 WL 2332150, *3 (Tex. Crim. App. June 9, 2010) (not designated for publication) (holding that applicant's *Penry* claim was not procedurally barred because it relied on *Tennard*, and this Court held in *Hood* that *Tennard* announced new law).

Even prior to this Court's 2010 decision in *Hood*, this Court had already held in a handful of subsequent habeas applications that then-recent Supreme Court cases regarding Texas' nullification instructions announced new law and that those death-row inmates were entitled to have the merits of their *Penry* claims addressed. *See Hood*, 304 S.W.3d, at *404, n. 40 (citing cases where this Court addressed *Penry* claims brought in successive litigation). In *Ex parte Martinez*, 233 S.W.3d 319 (Tex. Crim. App. 2007), this Court addressed the merits of a *Penry* claim

raised in a subsequent habeas application decided after the claim had been exhausted on direct appeal, reasoning that it was based on "binding and directly relevant United States Supreme Court precedent":

> We initially note that the *Penry* claim presented in applicant's subsequent writ is based on binding and directly relevant United States Supreme Court precedent decided *after applicant had exhausted this Penry claim at trial and on direct appeal* and after applicant had filed his first state habeas application. Under these circumstances, we affirm our initial determination in our order of March 24, 2006, that applicant's subsequent state habeas application is not procedurally barred as an abuse of the writ under Article 11.071, Section 5(a).

*Martinez*, 233 S.W.3d at 322-23 (internal citations omitted) (emphasis added). *See also Ex parte Moreno*, 245 S.W.3d 419 (Tex. Crim. App. 2008) (reconsidering applicant's previously dismissed *Penry* claim, concluding that *Abdul–Kabir, Brewer, Smith II,* and *Tennard* constituted a new legal basis under 11.071, § 5, and holding that those cases held that a defendant's mitigating evidence of "a troubled childhood" required special instructions so that the jury could fully consider its mitigating value outside the statutory special issues).

While Mr. Lizcano is raising his *Atkins* claim in an initial and not subsequent habeas application, the same principles permitting consideration of previously dismissed claims apply. The trial court failed to take into consideration the change in law occasioned by the Supreme Court's decision in *Hall* when it made its recommended findings to this Court. *Hall* is a binding and directly relevant Supreme Court decision that allows this Court to consider the merits of

Mr. Lizcano's *Atkins* claim. Although *Hall* focused on the first prong of the test for intellectual disability – the IQ score – *Hall's* emphasis on medically acceptable standards in defining intellectually disability is instructive in this case. The prior rejection of Mr. Lizcano's claim that he is intellectual disabled and thus ineligible for execution suffers from the same defects that the Supreme Court found unconstitutional in *Hall*, because it disregarded medical practice and was not informed by any diagnostic framework.

Because Mr. Lizcano is intellectually disabled under the medical standard dictated by *Hall*, Mr. Lizcano urges this Court to grant habeas relief on his *Atkins* claim. At a minimum, this Court should remand his case to the trial court for consideration of the impact of *Hall* on his *Atkins* claim, or, in the alternative, determine whether *Hall* constitutes new law.

## IV. Previous litigation of Mr. Lizcano's intellectual disability was not informed by any diagnostic framework, in contravention of *Hall*.

Under the medical definition of intellectual disability, a person is disabled when the following exists:

(1) significant subaverage intellectual functioning (i.e., low IQ), existing concurrently with

(2) limitations in adaptive functioning ("<u>adaptive deficits</u>") in at least one of three categories of adaptive skills: conceptual, social, and practical;[8]

---

[8] Representative conceptual skills relevant to the adaptive deficits analysis include language, reading, writing, ability to manage money, and self-direction. Representative social skills include interpersonal, responsibility, self-esteem, gullibility, naiveté, ability to follow rules and laws, and

(3) which manifest before the age of eighteen (18).[9]

Mr. Lizcano presented evidence during the punishment phase of his capital trial that he is a person with intellectual disability. At the commencement of jury deliberations, the trial court instructed the jury to answer three special issues, the first of which was, "Do you find by a preponderance of the evidence that Defendant is a person with mental retardation?" (Charge of the Court for the Punishment Phase, p. 1). The court defined mental retardation as follows: "Mental retardation is a disability characterized by: (1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Id*. at 2. The instructions went on to define adaptive deficits as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." *Id.*[10] The jury answered "no" to this special issue, and answered the remaining two special issues in such a way as to return a death sentence.

---

ability to avoid victimization. Representative practical skills include daily living, occupational skills, and ability to maintain a safe environment. *See* 6CR:1545 at ¶ 37.

[9] *Atkins*, 536 U.S. at 309, n3; *Ex Parte Briseno*, 135 S.W.3d at 7.

[10] Similarly, this Court also relied on the definition of "adaptive behavior" as defined by Section 591.003(1) of the Health and Safety Code when it evaluated Mr. Lizcano's sufficiency of the evidence claim regarding mental retardation on direct appeal. *Lizcano v. State*, No. AP-75,879, 2010 WL 181772, *12 (Tex. Crim. App. May 5, 2010).

15

On direct appeal, Mr. Lizcano raised several points of error regarding the jury's failure to find mental retardation, including a claim that the jury's answer on that issue was against the great weight of the evidence, especially in light of the expert testimony offered by the defense and the absence of any contrary expert testimony from the State. Brief for Appellant at 100-101, *Lizcano v. State*, No. AP-75,879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010). This Court found that Mr. Lizcano "clearly satisfied" the first prong of the mental retardation definition by a preponderance of the evidence. *Lizcano*, at *12. However, because it found there was significant evidence admitted that "supported the appellant's effectiveness in meeting standards of personal independence and social responsibility," this Court affirmed the jury's negative finding on mental retardation. *Id.* at *15.

Mr. Lizcano's claim concerning intellectual disability on direct appeal was not guided by the diagnostic criteria relied upon in *Atkins* and now required by *Hall.* Indeed, this Court has not restricted juries to consideration of the clinical factors for intellectual disability, thereby leaving the jury to decide "*what the Eighth Amendment standard for determining mental retardation is in the first place.*" *Lizcano v. State*, No. AP-75879, 2010 WL 1817772, at *32 (Tex. Crim. App. May 5, 2010) (Price, J., concurring and dissenting) (emphasis in original). This is in direct contravention of *Hall.*

The dissenting opinion in Mr. Lizcano's direct appeal highlighted the deficiencies in the intellectual disability standards as applied in Texas. Specifically, the dissent criticized the majority for emphasizing in its analysis the definition of "adaptive behavior" as used in § 591.003(1) of the Texas Health and Safety Code and the AAMR, while ignoring the "specific diagnostic criteria included in the AAMR definition." *Lizcano v. State*, 2010 WL 1817772, at *33-34 ("Today the Court fails to take these diagnostic criteria into account in gauging whether the jury's rejection of mental retardation is against the great weight and preponderance of the evidence. It is not entirely clear to me why."). The dissent went on to warn that "it is no solution to [the exceedingly subjective nature of the adaptive-deficit criteria] to substitute the normative caprice of the fact-finder for the comparative scientific objectivity inherent in the diagnostic criteria." *Id.* at *40.

Indeed, while the majority opinion recognized that there was evidence presented at trial relevant to Mr. Lizcano's limitations in adaptive functioning, it also prescribed weight to Mr. Lizcano's adaptive abilities. On the one hand, the court noted that Mr. Lizcano "had trouble following instructions and performing fairly simple tasks in the work environment;" "used limited vocabulary and did not seem to understand humor;" "could not perform certain simple personal tasks such as reading an analog clock, following directions to a location, or operating a VCR;" and "had difficulty learning and socializing." *Id*. at *15. It then went on to

17

describe the ways in which Mr. Lizcano did not exhibit limitations in certain areas of adaptive behavior, including evidence that he made regular payments on a car that he purchased as a co-buyer; had romantic relationships with two women, neither of whom considered him to be mentally retarded; and sent money home to assist his family. *Id.*

In assessing adaptive deficits, the focus is not on whether or not Mr. Lizcano can perform one or more of these skills. It is presumed that even an intellectually disabled individual will have strengths in some of these areas. 6CR:1545 at ¶ 38; 6RR:219-223; *see also* 2010 AAIDD Manual, at 47 ("Thus, in the process of diagnosing ID, significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in some adaptive skills."). Rather, the clinical definitions ask whether an individual experiences "significant limitations" in at least one category of adaptive skills. 6CR:1544-46 at ¶¶ 34-41; John H. Blume, Sheri Johnson, & Christopher W. Seeds, *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 Cornell J. L. & Pub. Pol'y 689, 705 (2009) ("Science does not prescribe a list of abilities that exclude mental retardation, but rather defines mental retardation by what an individual cannot do."). This allows the clinician to confirm that the intellectual disability suggested by IQ scores impacts an individual's ability to function. As one of the nation's leading experts on intellectual disability,

cited in *Atkins*, explains "The sole purpose of the adaptive prong of the definition for the criminal justice system is to ascertain that the measured intellectual impairment has had real-life consequences, and thus it is the presence of confirming deficits that must be the diagnostician's focus." James W. Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues*, 27 Mental & Physical Disability L. Rep. 11, 9 n. 25 (2003).

This loose interpretation of adaptive behavior cannot withstand constitutional muster – a jury finding of no intellectual disability blessed by this Court on direct appeal, despite overwhelming and undisputed evidence that Mr. Lizcano meets the clinical, diagnostic criteria of intellectual disability as confirmed by every mental health professional to have evaluated him with the use of generally accepted, standardized instruments.

## V. After *Hall,* clinical standards for establishing intellectual disability should apply in Texas and Mr. Lizcano should be granted relief on his *Atkins* claim.

Here, it is undisputed that Mr. Lizcano falls well below the standard deviations for intellectual disability on his IQ tests. The State admitted this fact on the record below and this Court found the same in its decision on direct appeal. 6RR:93-94; *Lizcano v. State*, 2010 WL 1817772 at *15 (Tex. Crim. App. May 5, 2010). Thus, the first prong of the test showing intellectual disability is met.

The American Association on Intellectual and Developmental Disability defines adaptive deficits as "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives." 2010 AAIDD Manual at 43. The AAIDD further provides that for a diagnosis of intellectual disability, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. *Id*. On these measures, "significant limitations" in adaptive behavior are defined as performance that is approximately two standard deviations below the mean of either (a) one of the following types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills. *Id*. Representative conceptual skills are "language, reading and writing, money concepts, and self-direction." *Id*. at 44. Representative social skills are "interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, avoids victimization." *Id*. Representative practical skills are "activities of daily living, instrumental activities of daily living, occupational skills, and maintains safe environments." *Id*.

The AAIDD explains that in the event that standardized assessments cannot be used, other information-gathering methods can be employed, including direct observation; review of school records, medical records, and previous psychological

evaluations; or interviews with individuals who know the person and have had the opportunity to observe the person in the community but may not be able to provide a comprehensive report regarding the individual's adaptive behavior in order to complete a standardized adaptive behavior scale. *Id.* at 48.

At trial, Mr. Lizcano showed deficits in adaptive behavior across every category of skills recognized by the AAIDD, including conceptual, practical, and social domains. Indeed, the evidence of Mr. Lizcano's adaptive deficits reveals that while Mr. Lizcano may have been superficially functional in limited ways as an adult, he actually performed few tasks alone or without substantial and meaningful assistance from those around him.[11]

But in addition to the evidence presented at trial concerning Mr. Lizcano's adaptive behavior, substantial new evidence of adaptive deficits was introduced at the habeas proceedings below. This includes a standardized assessment reflecting that Mr. Lizcano's skills were in the extremely low range; results of face-to-face interviews that were conducted by mental health professionals with family members; and clinical observations by two mental health professionals who reported a lack of executive functioning skills. In all, Mr. Lizcano's proposed

---

[11] *See, e.g.,* 6CR:1612-13 at ¶¶ 324-327 (Mr. Lizcano needed help buying his truck, driving his truck, paying his bills, and using his cell phone.)

21

findings list some 25 pages of new evidence presented at the habeas stage reflecting adaptive deficits.[12]

All in all, the examples of common every day skills that others in his community performed but Mr. Lizcano could not are many.[13] For instance, people who knew Mr. Lizcano as a young boy in Mexico where he was raised testified that he could not:

- use a *talache*, a common tool in his community, or a slingshot to hunt mice, even though others his age did it all the time.

- measure medication needed to maintain the family's goats, despite the fact that his brother repeatedly tried to teach him.

- maintain sufficient focus to herd and guard the goats.

- drive a plow using horses because he could not control the horses to make a straight line.

- drive a plow using donkeys, which were considered the easiest of animals to drive.

- prepare the animals for attaching the plow, despite the fact that his older brother repeatedly tried to teach him; he often put the collar harness on backward.

- appropriately plant crops or lay seed, which was considered a girl's job because it was easier than driving a plow.

- appreciate the danger in taking goats out to pasture when it was raining, when his siblings knew that the goats could be swept away in the arroyos.

---

[12] 6CR:1554-79.

[13] *See* 6CR:1603-10 at ¶¶ 282-315.

- scrape the fibers of the *lechuguilla* plant, a source of income for the family; he would scrape backwards, and the fibers would come out folded, curled up, and every which way.

- change a tire or fix a chain on a bicycle, the family's only mode of transportation.

- lay a cement block, despite the fact that his older brother tried to teach him.

In fact, he struggled so extensively with the daily chores that others his age were expected to perform that he was relegated to the most rudimentary tasks available: cleaning dirt out of water tanks and carrying firewood.[14]

Additionally, witnesses testified that Mr. Lizcano exhibited deficits encompassed within the conceptual domain of adaptive deficits, including that he:

- had trouble writing in elementary school, compared to his younger sister Lucia; he would leave out letters or sometimes shorten the words.

- read very slowly when he read out loud.

- copied his homework from other children because he was "not good at learning."

- would run all of his letters together when he wrote.

- could not tell a story in detail; if something happened to him, he would not say anything at all, or just give very short responses when asked.

---

[14] *See* 6CR:1554-57 at ¶¶ 74-86.

23

- did not have a big vocabulary and had a hard time expressing himself.

Finally, within the social domain of adaptive deficits, Mr. Lizcano:

- had trouble socializing with other children as a young boy and barely spoke.

- was very bad at volleyball, a common game that the children played on the *rancho*, because he did not understand the rules; he repeatedly touched the line or the net, even though the children would yell "foul" every time he did.

- would not talk in group settings, such that other children took advantage of him because he was timid and would not respond to anyone.

- was a follower.

- was timid and embarrassed around girls and never had a girlfriend in Mexico, even though it is customary to start showing interest in girls around 13-14 years of age.

Mr. Lizcano's struggles persisted into adulthood and have continued to this day.[15] As an adult, he struggles to communicate, demonstrating below average vocabulary, low content of speech, hesitancy in responding to interview questions, and difficulty comprehending moderately complex task instructions.[16] He takes long pauses before responding to questions, inappropriately laughs when presented with complex tasks, and has trouble maintaining eye contact.[17] He had extensive difficulties at his landscaping job in Dallas, forgetting directions, his tasks, and

---

[15] *See* 6CR:1610-13 at ¶¶ 316-327.

[16] 6CR:1562 at ¶ 110.

[17] 6CR:1562 at ¶ 110-111.

how to use a tape measure.[18] He often would walk away from cash registers without change.[19] The list of Mr. Lizcano's adaptive struggles both as a child and as an adult runs on and on.[20]

There is a wealth of evidence (much presented in the habeas proceedings) showing Mr. Lizcano's adaptive deficits across a broad range of functional activities. This is all that is required to declare him intellectually disabled under the clinical standards that should govern this case. Yet, the jury—lacking the clinical definition of intellectual disability—failed to find Mr. Lizcano intellectually disabled.

As a recent concurring decision from this Court points out, the criteria used to evaluate adaptive deficits is "decidedly non-diagnostic." *Ex Parte Cathey*, No. WR-55,161-02, 2014 WL 5639162, at *20 (Tex. Crim. App. Nov. 5, 2014). It is clear after *Hall* that the very problems with the Texas standards for intellectual disability pointed out by the dissent in the opinion on direct appeal – the failure to define intellectual disability within the framework of the clinical guidelines and the commensurate deference to the jury's fact findings made without reference to those guidelines – led to an absurd and constitutionally infirm result that would allow a

---

[18] 6CR:1611 at ¶ 321.

[19] 6CR:1613 at ¶ 326.

[20] *See* 6CR:1603-10 at ¶¶ 282-315 (childhood adaptive deficits); 6CR:1617 at ¶ 347 (behavior in US), 6CR:1618 at ¶¶ 348-349 (Marta relationship).

clearly intellectually disabled man to be put to death. *Hall* and *Atkins* forbid such a result as violative of the Eighth and Fourteenth Amendments to the Constitution.

Here, the evidence presented at the writ hearing is undisputed and shows that Mr. Lizcano suffered adaptive deficits in each category. The Court could, therefore, find Mr. Lizcano intellectually disabled as a matter of law and commute his sentence. At a minimum, however, he should be remanded to the trial court to address the impact of *Hall* on his *Atkins* claim or, in the alternative, this Court should determine whether *Hall* constitutes new law.

## CONCLUSION

In light of *Hall* and the overwhelming evidence of intellectual disability present in this case, Mr. Lizcano urges the Court to disregard the trial court's proposed findings of fact and conclusions of law and instead find that Mr. Lizcano is intellectually disabled and therefore ineligible for the death penalty. At a minimum, Mr. Lizcano respectfully request that this Court remand his case to the trial court for consideration of the impact of *Hall* on his *Atkins* claim, or, in the alternative, make a determination as to whether *Hall* constitutes new law.

Respectfully submitted,


*/s/ Debbie McComas*

Debbie McComas
State Bar No. 00794261
Stephanie Sivinski
State Bar No. 24075080
**HAYNES & BOONE, LLP**
2323 Victory Ave. Suite 700
Dallas, Texas  75219
Telephone:  214-651-5000
Telecopier:  214-651-5940

Alma Lagarda
State Bar No. 24755810
**TEXAS DEFENDER SERVICE**
510 S. Congress, Suite 304
Austin, TX  78704
Telephone:  512-320-8300
Telecopier:  512-477-2153

**ATTORNEYS FOR APPLICANT**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the following attorneys in the manner indicated on the 16th day of January, 2015.

Jaclyn O'Connor                 *Via hand delivery and Email*
Assistant District Attorney      *(Jaclyn.OConnor@dallascounty.org)*
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207-4399


*/s/ Debbie McComas*
Debbie McComas