WR-48,152-07
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/22/2015 2:34:59 PM
Accepted 1/22/2015 2:53:27 PM
ABEL ACOSTA
CLERK

# WR-48,152-08

## EX PARTE GARCIA GLEN WHITE

### WRIT NO. 48,152-07

RECEIVED
COURT OF CRIMINAL APPEALS
1/22/2015
ABEL ACOSTA, CLERK

### IN THE COURT OF CRIMINAL APPEALS

### AT

### AUSTIN, TEXAS

_____

Cause No. 723847-E

| | | |
|---|---|---|
| EX PARTE | § | IN THE 180TH DISTRICT COURT |
| | § | OF |
| GARCIA GLEN WHITE, Applicant | § | HARRIS COUNTY, TEXAS |

## STATE'S MOTION TO DISMISS APPLICATION FOR WRIT OF HABEAS CORPUS

Respondent, the State of Texas, by and through its Assistant District Attorney for Harris County, files this, its Motion requesting that the Court of Criminal Appeals dismiss the applicant's fourth subsequent state application for writ of habeas corpus. The applicant does not satisfy the requirements for the filing of an additional subsequent writ application under TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5, and, alternatively, the applicant's grounds for relief are meritless. In support, Respondent would show the following:

1

# I. PROCEDURAL HISTORY

The applicant is confined pursuant to the judgment and sentence of the 180th District Court of Harris County, Texas, in cause no. 723847 (hereinafter "the primary case"), wherein a jury convicted the applicant of the felony offense of capital murder. On July 23, 1996, the jury answered "yes" to the first two special issues, and "no" to the last, and the trial court assessed punishment at death.

The Court of Criminal Appeals affirmed the applicant's conviction in an unpublished opinion delivered on June 17, 1998. *White v. State*, No. 72580 (Tex. Crim. App. June 17, 1998)(not designated for publication).

On February 21, 2001, the Court of Criminal Appeals denied the applicant relief on his initial state habeas application, cause no. 723847-A. *Ex parte White*, WR-48,152-01 (Tex. Crim. App. Feb. 21, 2001).

On April 17, 2001, the applicant filed an initial federal habeas petition. However, the applicant subsequently moved to dismiss his petition in order to return to state court, and the federal district court granted the applicant's motion on January 9, 2002. *White v. Thaler*, No. H-02-01805, 2011 WL 4625361 (S.D. Tex. Sept. 30, 2011).

On January 11, 2002, the applicant filed a subsequent state habeas application, cause no. 723847-B. The Court of Criminal Appeals dismissed

2

the applicant's subsequent state habeas application for abuse of the writ on April 24, 2002. *Ex parte White*, WR-48,152-02 (Tex. Crim. App. April 24, 2002).

On May 3, 2002, the applicant filed a federal habeas petition, and the district court granted the applicant an administrative stay pending the results of DNA testing. *White v. Thaler*, No. H-02-01805, 2011 WL 4625361 (S.D. Tex. Sept. 30, 2011).

On June 30, 2007, and January 28, 2009, the applicant filed his second and third subsequent state habeas applications, cause nos. 723847-C and 723847-D. The Court of Criminal Appeals dismissed both habeas petitions on May 6, 2009. *Ex parte White*, WR-48,152-03 & WR-48,152-04 (Tex. Crim. App. May 6, 2009).

On September 30, 2011, following completion of the applicant's post-conviction DNA testing, the federal district court dismissed the applicant's federal habeas petition and denied the applicant a certificate of appealability (COA). *White v. Thaler*, No. H-02-01805, 2011 WL 4625361 (S.D. Tex. Sept. 30, 2011).

On April 1, 2013, the Fifth Circuit Court of Appeals denied the applicant's application for COA. *White v. Thaler*, 522 Fed. App'x. 226, 2013 WL 1442568 (5th Cir. 2013).

3

On January 13, 2014, the United States Supreme Court denied the applicant's petition for writ of certiorari. *White v. Stephens*, __ U.S. __, 134 S.Ct. 907 (2014).

On January 15, 2015, the applicant filed requests for a stay of execution and an authorization to file a subsequent federal habeas application in the Fifth Circuit Court of Appeals.

On January 15, 2015, the Court of Criminal Appeals denied without written order the applicant's motions for stay of execution, leave to file an original application for writ of prohibition and leave to file an original application for writ of habeas corpus. *Ex parte White*, No. WR-48,152-05 & WR-48,152-06 (Tex. Crim. App. Jan. 15, 2015).

On January 21, 2015, the Court of Criminal Appeals denied without written order the applicant's motion for leave to file a second original application for writ of prohibition. *Ex parte White*, No. WR-48,152-07 (Tex. Crim. App. Jan. 21, 2015).

On January 20, 2015, the applicant filed a fourth subsequent state application for writ of habeas corpus in cause no. 723847-E.

The applicant's fourth subsequent state habeas application, cause no. 723847-E, as well as his requests for a stay of execution and an authorization to file a subsequent federal habeas application are currently pending.

The applicant is scheduled for execution on January 28, 2015.

## II. TRIAL PROCEEDINGS

State's Evidence at Guilt-Innocence

King Solomon was a sixty-four year old man who was married and had seven children (XV S.F. at 35). Bonita Edwards was his girlfriend in November, 1989, and she lived with her identical twin daughters, Annette and the complainant Bernette (XV S.F. at 35-6). Solomon often saw Bonita on the weekends and called her during the week (XV S.F. at 38). He talked to her on the telephone on Wednesday, November 29; however, she did not answer the phone when he called her the next day (XV S.F. at 39). In fact, there was no answer for the following two days (XV S.F. at 39).

On the third day, Saturday morning, Solomon went to Bonita's apartment (XV S.F. at 40). He knocked on her door, but there was no answer (XV S.F. at 40). He then returned home and watched television for much of the day (RR. XV - 41). Later in the day, Solomon had his wife drop him off approximately two blocks from Bonita's apartment (XV S.F. at 41). He walked over to her apartment and saw another man standing on the porch (XV S.F. at 41). The other man claimed to be responsible for maintenance but stated that he did not have a key to the apartment (XV S.F. at 41). The man told Solomon to get the manager (XV S.F. at 41). When the apartment

manager opened the door, Solomon saw two bodies on the floor (XV S.F. at 45). The manager then pulled the door back and said, "Don't you-all come in" (XV S.F. at 46).

Leonard Dawson, Houston Police Department (HPD) Homicide Crime Scene Unit, was called to the scene (XV S.F. at 56-7). There was no sign of forced entry on the front door to the apartment, and all of the windows were locked and closed (XV S.F. at 69, 149). A bloody sock was found underneath the Christmas tree (XV S.F. at 83). The door to the south bedroom appeared to have been forced open (XV S.F. at 91, 151).

Bonita was found in the dining and living room area (XV S.F. at 66-7). She was wearing a blue and white printed blouse and black panties (XV S.F. at 167). She had fourteen stab wounds to her chest: seven superficial and seven that were five to six inches deep into her left chest area (XVII S.F. at 275, 278, 280). One stab wound perforated her heart, and the others penetrated her left lung (XVII S.F. at 278). All of the seven deep wounds had the potential to kill her (XVII S.F. at 282). Bonita also had a contusion on the right side of her neck (XVII S.F. at 277).

Annette was found just inside the front door next to a love seat, just wearing panties (XV S.F. at 66-7, 84). She had sustained eight stab wounds to her chest, one stab wound in her neck, and two defensive wounds: a stab

6

wound in her right arm and a cutting wound on her right hand (XVII S.F. at 287-288, 292-93). One of Annette's chest wounds involved her left lung and was fatal (XVII S.F. at 291). The neck wound penetrated into her trachea (XVII S.F. at 292). She also suffered from two blunt trauma abrasions over her left cheek (XVII S.F. at 288-89).

The complainant, Bernette, was found in the south bedroom facing a dresser and a bed (XV S.F. at 67-8). A pink shirt was wrapped around the back of her neck and through her mouth to form a gag (XV S.F. at 85, 147). There was a white discharge near her vaginal area and a white substance on her lower abdomen indicating possible sexual assault (XV S.F. at 147). Semen was detected on her vaginal and rectal swabs (XVI S.F. at 247). Bernette had two stab wounds to her neck, eleven stab wounds to her chest, stab wounds in the left elbow and hand, a cutting wound on the right hand, and a stab wound on her right arm (XVII S.F. at 300). Any of the neck wounds or five of the chest wounds were sufficient to cause death (XVII S.F. at 307). The applicant's DNA matched the semen gathered from the complainant, and the probability that the applicant was the source of the semen was 99.9999 percent (XVII S.F. at 384-85).

Tecumseh Manuel was a thirty-four year old man who had known the applicant "like a brother" for his entire life (XVI S.F. at 185). The applicant

7

told Manuel that he stabbed a woman and her twin daughters (XVI S.F. at 186). On July 20, 1995, Manuel relayed this information to Todd Miller, HPD Homicide Division (XVI S.F. at 186, 189). The applicant was arrested for the crime at approximately 8:20 p.m., the next day and read his *Miranda* warnings (XVI S.F. at 190-91).

The applicant gave a videotaped statement in which he stated that he and Terrence Moore went over to Bonita's apartment and that both men had rocks of cocaine. *State's Ex. 55*. The men agreed to share their drugs with Bonita in exchange for sex. *State's Ex. 55*. Both men got naked; however, neither was able to get sexually aroused, and they refused to share the drugs with Bonita. *State's Ex. 55*. The applicant stated that Bonita then became upset and grabbed a knife out of the kitchen drawer. *State's Ex. 55*. The applicant grabbed her from behind while Moore took the knife from Bonita. *State's Ex. 55*. The applicant stated that he then threw Bonita on the floor while Moore stabbed her. *State's Ex. 55*.

The applicant further stated that, while Bonita was screaming and kicking, Annette and the complainant ran out of the bedroom. *State's Ex. 55*. The applicant grabbed the daughter who ran toward the front door. *State's Ex. 55*. He touched her breasts and vagina, held her down with his hand over her mouth, and then ejaculated on her. *State's Ex. 55*. Meanwhile, Moore

8

forced open the bedroom door to obtain access to the other daughter. *State's Ex. 55*. Moore then exited from the bedroom and stabbed the daughter that was with the applicant. *State's Ex. 55*. The applicant stated that Moore was wearing gloves and never ejaculated. *State's Ex. 55*.

After an investigation, Miller determined that Moore had been killed on July 25, 1989, or four months prior to the deaths of the complainant, her sister and her mother (XVI S.F. at 205-6, 224). On July 28, 1995, Miller again interviewed the applicant (XVI S.F. at 206). After advising the applicant of his rights, Miller confronted the applicant with the information regarding Moore (XVI S.F. at 206-7). The applicant waived his rights and gave another videotaped statement during which he stated, "I made it all up...With the Mom...She reached for a knife, and I took the knife and stabbed her...Some kids come out...I went into the bedroom after them. Stab...I stabbed one in the bedroom and one in the living room. That's all I want to talk about." *State's Ex. 56.*

State's Evidence at Punishment

During the punishment phase, the State reoffered all of the evidence admitted during the guilt phase and introduced evidence that on March 20, 1995, the applicant received two years in state jail for theft which was probated for three years (XX S.F. at 8)(XXI S.F. at 449, 452). John Thomas, a

Harris County adult probation officer, testified that the applicant used marijuana and tested positive for cocaine (XXI S.F. at 454, 460).

The State also presented evidence regarding the murder of Greta Williams.  At approximately 11:30 a.m., on November 1, 1989, Philip Clark with HPD was called to the 3400 block of Linn where he met Raymond Manuel who then directed Clark to a vacant house at 3419 Linn (XX S.F. at 22-6).  Clark pulled back a sheet of plywood that covered one of the windows and saw a body in the back of the house (XX S.F. at 24).

Wayne Wendel, HPD Homicide Division, responded to the scene where he saw both Manuel and the applicant (XX S.F. at 29).  The house was boarded up and had been used by neighborhood drug users (XX S.F. at 30).  Inside was the body of Greta Williams; she had been beaten to death and was partially covered by a carpet (XX S.F. at 31).  There was evidence of severe trauma to her head, and there were medium velocity blood spatter stains along the west wall indicating repeated blows (XX S.F. at 37, 40).  Williams' clothes were under her body, and there were broken teeth by her neck (XX S.F. at 38, 39).  Also at the scene was a cigarette lighter with blood on it and a used condom on the back steps (XX S.F. at 54-5).

On November 2, 1989, Harminder S. Narula, a Harris County medical examiner, performed Williams' autopsy (XX S.F. at 92).  She had blunt trauma

over her face, head, chest, back, left forearm, and left hand, and six lacerations on her left eyelid, mouth and chin (XX S.F. at 95-6). Williams had a fracture on her left upper jaw, loose teeth in her lower jaw, and chipped and broken upper teeth (XX S.F. at 97). There was bruising and a slight tear on her heart as well as fractured ribs and a partial crushing of her liver (XX S.F. at 100). Williams died from blunt trauma to her head, face, chest, and abdomen which caused the fractured jaw, fractured ribs and lacerated liver (XX S.F. at 102-3). A drug screen was negative, and there was no evidence of semen in the body (XX S.F. at 103-4).

Wendel talked to Manuel three different times about Williams' murder (XX S.F. at 43). Furthermore, police took a written statement from the applicant concerning the incident (XX S.F. at 46, 65). The applicant stated that he was sitting on a front porch when Williams came by and asked what was up (XX S.F. at 86). The applicant stated that Williams then left, and he saw two guys named Daniel Noel and Tony Trahan say "hey baby" to her (XX S.F. at 87). The case was referred to the grand jury which declined to indict the applicant (XX S.F. at 49-50).

On July 13, 1995, sixteen-year-old Hau Trung Pham was working with his father on Roland Street in his father's convenience store (XIX S.F. at 32-3). Pham's father weighed approximately 111 pounds and was 57 years old (XIX

S.F. at 54).  At approximately 11:00 that morning, the applicant and another man came into the store and then exited (XIX S.F. at 34, 51).  At about 3:00 p.m., Pham was asleep in the storeroom when he heard a scream (XIX S.F. at 34).  The two men had returned, and one of them grabbed Pham's neck and told him to open up the cash register (XIX S.F. at 35).  Pham saw his father laying on the floor with the applicant standing next to him (XIX S.F. at 35, 42).  There was a broken chair very close to his father (XIX S.F. at 43).  Pham's father had blood in his eyes and said nothing (XIX S.F. at 37).  One of the robbers then picked up the cash register and fumbled underneath it, while the other robber took Pham to the back of the store and put a milk pot on his head (XIX S.F. at 37).  When the men left, Pham called the police (XIX S.F. at 37-43).

James L. Crowson, HPD, responded to the call at the Village Food Market at 3115 Roland (XIX S.F. at 11).  He saw that an older Asian man had a large gash over his left eye and was incoherent (XIX S.F. at 12).  Crowson did not call the crime scene unit because the crime was just an aggravated robbery at the time; however, Pham's father died within a few days as a result of the injuries sustained during the robbery (XIX S.F. at 14).  No suspects were detained at the scene (XIX S.F. at 17).

Todd Miller, HPD homicide division, was contacted about the Roland Street robbery on July 17, 1995, after Pham's father died (XIX S.F. at 60-1). During his investigation, he talked to Terrence Davis, Perry Harvey, and Tecumseh Manuel (XIX S.F. at 65). Manuel told Miller about the Roland Street robbery and the present triple murder on Weaver (XIX S.F. at 67). The applicant then confessed to the crime. *State's Ex. 96*.

On July 17, 1995, Eduardo Bellas, Harris County medical examiner, conducted an autopsy of Pham's father (XIX S.F. at 81). The victim had a fracture immediately above his eyeballs which was consistent with multiple blows to that area (XIX S.F. at 84). The primary causes of death were a fractured skull, brain contusions and lacerations, and infections to both lungs which were complications from the other injuries (XIX S.F. at 84).

<u>Defendant's Evidence at Punishment</u>

Lizzie White, the applicant's mother, testified that the applicant was born in Houston, and he was the third oldest of seven children (XXI S.F. at 225-7). Lizzie lived in Kashmere Gardens and in the Fifth Ward area of Houston (XXI S.F. at 228).

Lizzie testified that the applicant went to Hilliard Elementary School, Fleming Middle School, and Wheatley High School, and that he was a poor student but had good conduct grades (XXI S.F. at 229-30). He did not miss a

day of school in the twelfth grade (XXI S.F. at 234). According to Lizzie, the applicant got along well with everyone and had no trouble with the juvenile authorities; however, when the applicant was about fourteen years old, he took one of his mother's cars (XXI S.F. at 235). Also, Lizzie was once called to school because the applicant did not dress for physical education (XXI S.F. at 236).

Lizzie testified that the applicant played football for Wheatley as a starter and graduated in 1981 (XXI S.F. at 237). The applicant then went to Lubbock Christian College to play football; but he injured a knee in 1982 and ended his football career (XXI S.F. at 239-40). The applicant dropped out of school and returned to Houston to recuperate (XXI S.F. at 240). The applicant then started painting houses and working for his father, Leon Charles, who had a mechanic's shop (XXI S.F. at 241). The applicant left home when he was about twenty-one and lived with the Manuel family (XXI S.F. at 247).

Lizzie stated that, in 1984, the applicant started sandblasting buildings with a company called Clean America (XXI S.F. at 244). In March of 1988, the applicant was hospitalized with a hurt hand and head after falling three or four stories off of a building (XXI S.F. at 246). When the applicant was released from the hospital, he did not come around the family as much (XXI

S.F. at 248). He started hanging out with drug users and lived with the mother of his children at the Manuels (XXI S.F. at 249). The applicant had three children: fourteen-year-old Christopher, ten-year-old Porsha, and six-year-old Jared (XXI S.F. at 249). The applicant was behind in child support; however, he still loved his children (XXI S.F. at 253). Finally, Lizzie asked the jury to give the applicant a life sentence (XXI S.F. at 254).[1]

Monica Garrett, the applicant's sister, testified that the applicant was a nice brother, and she helped him with his homework (XXI S.F. at 271). She also stated that the applicant was a good football player, but his college career ended with a knee injury after the first semester (XXI S.F. at 273). Finally, Garrett asked the jury for a life sentence (XXI S.F. at 275).[2]

Robert Yohman, Ph.D., clinical neuropsychologist, testified that he reviewed the applicant's records and tested him with the Wechsler Adult Intelligence Scale, academic achievement batteries, and personality tests (XXI S.F. at 312-13). Yohman stated that the applicant had an IQ of 76, which was in the sixth percentile for intellectual functioning and borderline between average and mental retardation (XXI S.F. at 315-16). The applicant did not

---

[1] Lizzie testified on cross-examination that the applicant had known Tecumseh and Raymond Manuel since junior high school (XXI S.F. at 259).
[2] On cross-examination, Garrett admitted that the applicant's grades improved when he applied himself, and the applicant never asked for help with his problems (XXI S.F. at 277-78).

have elevated levels of distress in his life which suggested that he handled his impulses through denial (XXI S.F. at 326-27). Yohman stated that cocaine use could accentuate impulsive behavior caused by a head injury (XXI S.F. at 336). Yohman concluded that the applicant would not be a future danger in a controlled prison environment because of the limitations on cocaine use (XXI S.F. at 346).[3]

Dennis Nelson, Ph.D., stated that the applicant had an IQ of 85 to 87 (XXI S.F. at 392). He concluded that the applicant was reasonably responsible, not violent, fairly quiet, somewhat socially inhibited, and not prone to digging into trouble (XXI S.F. at 410). The applicant told Nelson that cocaine was the major drug that he abused (XXI S.F. at 413). Nelson stated that the applicant was dependent on circumstances and that a properly functioning prison should be a controlled environment (XXI S.F. at 425).

## III. APPLICANT FAILS TO MEET ART. 11.071, § 5 REQUIREMENTS ALTERNATIVELY, APPLICANT'S CLAIMS ARE MERITLESS

In the instant subsequent state application for writ of habeas corpus filed on January 20, 2015, the applicant urges the following three grounds for

---

[3] During cross-examination, Yohman admitted that there was no evidence that the applicant suffered a brain injury (XXI S.F. at 352). He also stated that, if the applicant lied during the interview, then the diagnosis of cocaine addiction was inaccurate (XXI S.F. at 365). Yohman stated that the applicant was capable of anger and lust (XXI S.F. at 370). Finally, Yohman admitted that his conclusions were based on the assumption that drugs were not available to prison inmates (XXI S.F. at 375).

relief: (1) that the applicant's invocation of counsel is entitled to more deference due to his alleged limited intellectual capacity; (2) that alleged newly discovered DNA evidence would have changed counsel's trial strategy and raised questions as to the applicant's culpability for the primary offense; and, (3) that alleged newly discovered scientific evidence presents compelling mitigating evidence that would have likely changed the jury's answers to the special issues. *Applicant's writ at 6, 14, 15.*

### -INVOCATION OF COUNSEL

The applicant's claim that his invocation of counsel is entitled to more deference due to his alleged limited intellectual capacity does not meet the statutory requirements for filing a subsequent state application for writ of habeas corpus. *See* TEX. CODE CRIM. PROC. art. 11071, § 5. The instant habeas claim is merely a reiteration of previously urged and rejected claims.

On direct appeal, the Court of Criminal Appeals overruled the applicant's challenge to the admissibility of his custodial statement based on his alleged invocation of the right to counsel. *White*, No. 72580, slip op. at 4-8. The applicant urged the same claim in his initial state habeas application, cause no. 723847-A, and the Court of Criminal Appeals adopted the trial court's findings and denied the applicant habeas relief. *White*, No. 48,152-01, slip op. at 2. In the applicant's second subsequent state habeas petition,

17

cause no. 723847-C, filed in 2007, the applicant alleged that he suffered from impairment and mental problems, including cocaine addiction, and was not competent to waive his rights to silence and counsel. *Applicant's writ, cause no. 723847-C, at p. 3, 7.* In his third subsequent state habeas petition, cause no. 723847-D, filed in 2009, the applicant relied on the 2008 psychological report of Patricia M. Averill, Ph.D., to argue that trial counsel was ineffective for failing to discover his IQ of 78. *Applicant's writ, cause no. 723847-D, at 3-5.* On May 6, 2009, the Court of Criminal Appeals dismissed the applicant's second and third subsequent state habeas applications, cause nos. 723847-C & D. *White*, WR-48,152-03 & WR-48,152-04.

The applicant again relied on Dr. Averill's 2008 report in his original application for writ of habeas corpus filed in the Court of Criminal Appeals on January 8, 2015, and denied on January 15, 2015. *White*, No. WR-48,152-05 & WR-48,152-06. Yet again, in the applicant's instant subsequent habeas application, he attempts to rely on Averill's 2008 report to argue that his invocation of cousel is entitled to more deference due to his alleged limited intellectual capacity. *Applicant's Appendix B.* In sum, the applicant presents nothing new in the instant habeas petition. He is presenting the same evidence which was previously rejected and dismissed. Regardless, the applicant's claim is without merit.

In her 2008 psychological report, Dr. Averill reported that the applicant attained a Full Scale IQ score of 78 on the Wechsler Adult Intelligence Scale – Third Edition; that he did not qualify for a diagnosis of mental retardation; that he functioned at a borderline intellectual level; and, that his intellectual limitations likely resulted in social vulnerabilities. Dr. Averill stated that the applicant's adaptive functioning was difficult to ascertain due to a lack of information, but she remarked that the applicant attended college on a football scholarship until he sustained a knee injury; that the applicant maintained employment for several years; that the applicant had a family; that the applicant got along well with others; and, that the applicant had no social/interpersonal skill difficulties. Notably, Dr. Averill reached no conclusions regarding the applicant's ability to invoke his right to counsel. *Applicant's Appendix B.*

There is no support for the applicant's assertions concerning his ability to invoke counsel or request for heightened scrutiny of his invocation of counsel. *See Delao v. State*, 235 S.W.3d 235, 241 (Tex. Crim. App. 2007)(holding that the totality of the circumstances standard for assessing the voluntariness of a confession given by a person of normal mentality is the appropriate standard to apply when a confession is made by someone suffering from mental retardation and mental illness). The Court of Criminal

19

Appeals has upheld the admission of confessions made by defendants suffering from mental impairments, including mental retardation. *See Bell v. State*, 582 SW.2d 800, 809 (Tex. Crim. App. 1979)(defendant was mildly mentally retarded and lacked capacity to read and understand certain statements); *Casias v. State*, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970)(defendant was illiterate with a second grade level education and an IQ of 68). The applicant fails to show that his invocation of counsel should be given more deference based on his intellectual capacity.

Also, to the extent that the applicant argues that he has low intellectual functioning, the applicant cannot now urge that his execution is barred under *Atkins v. Virginia,* 536 U.S. 304 (2002), for two reasons. First, the applicant has bypassed the opportunity to raise the issue of mental retardation.[4] *See Ex parte Blue,* 230 S.W.3d 151, 154 (Tex. Crim. App. 2007)(holding that constitutional prohibition against executing mentally retarded person does not mean that such claim can be made "at any time;" the Legislature may exercise its "regulatory authority to impose limitations on successive and

---

[4] In *Hall v. Florida,* __ U.S. __, 134 S. Ct. 1986, 1990 (May 27, 2014), the United States Supreme Court replaced the term "mental retardation" with "intellectual disability" in its opinion. Because the applicant's claims and the Court's ensuing orders predate *Hall* and use the term "mental retardation," the State will refer to mental retardation unless discussing an opinion where the term "intellectual disability" is used.

abusive state post-conviction writs").  Second, given the applicant's IQ testing results, the applicant cannot satisfy even the first prong criteria for mental retardation, significantly subaverage general intellectual functioning, much less the adaptive functioning and early onset prongs.  *Ex parte Briseno,* 135 S.W.3d 1, 7 (Tex. Crim. App. 2004)(to establish mental retardation, defendant must prove by a preponderance of the evidence that he meets all three prongs of the three-prong test of mental retardation:  (1) significantly subaverage general intellectual functioning; (2) that is concurrent with deficits in adaptive behavior; (3) and, originates during the developmental period); *see also* TEX. HEALTH & SAFETY CODE, § 591.003 (13).

Finally, the applicant's argument that the Court of Criminal Appeals should consider the instant habeas claim because *Hall v. Florida*, __ U.S. __, 134 S.Ct. 1986 (2014), announced a new rule of law, similar to *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005), is meritless.  *Applicant's writ at 14-15*.  The Fifth Circuit recently held that *Hall* did not implicate Texas.  *Mays v. Stephens*, 757 F.3d 211, 218 (5th Cir. 2014).  Further, Hall did not affect the Fifth Circuit's reading and application of *Briseno* or overturn/question *Atkins*. *Id.*

***-DNA EVIDENCE***

The applicant's claim that he is entitled to habeas relief because of the alleged impact of post-conviction DNA retesting does not meet the statutory requirements for filing a subsequent state application for writ of habeas corpus.[5]  *See* TEX. CODE CRIM. PROC. art. 11071, § 5.  Again, the applicant merely reurges a previously raised and rejected allegation and fails to meet the statutory requirements for filing a subsequent state application for writ of habeas corpus.  *See* TEX. CODE CRIM. PROC. art. 11071, § 5.

In his second subsequent state habeas writ, cause no. 723847-C, which the Court of Criminal Appeals dismissed as an abuse of the writ in 2009, the applicant relied on a 2004 Identigene DNA report to argue that there was another unaccounted for individual at the scene which was material new evidence and raised a colorable claim of actual innocence.  *White*, WR-48,152-03 & WR-48,152-04.

In his first amended federal habeas petition, filed on December 31, 2009, the applicant again relied on the 2004 Identigene DNA report to claim that he was actually innocent of the primary offense and to argue that the

---

[5] In 2003 and 2004, Identigene conducted retesting of the applicant's DNA evidence and issued a series of reports.  *State's Ex. A.*  Upon the request of habeas counsel, Serological Research Institute also analyzed the evidence and issued a report of its findings on October 18, 2006.  *State's Ex. B.*

2004 DNA testing showed that an unknown third person was present at the crime scene. *White*, No. H-02-1805, 2011 WL 4625361, at *3-5. The federal district court held that the applicant failed to demonstrate that his conviction or sentence constituted a fundamental miscarriage of justice because, while the DNA retesting established that an unidentified third person was at the complainant's apartment at some point, retesting also conclusively established that the applicant was present at the scene and ejaculated. *Id*. at *5.

In his instant subsequent habeas application, the applicant once again presents the 2004 Identigene report and also presents the January 20, 2015 affidavit of trial counsel Brian Benken to argue that another person's DNA, likely a male, was present at the scene. The applicant also argues that such information might have allowed trial counsel to argue that the applicant was merely present at the scene and acted as a party. *Applicant's Appendices C & D*. Regardless of the applicant's failure to meet the requirements of TEX. CODE CRIM. PROC. art. 11.07, § 5 for the filing of his subsequent claim, however, the applicant's claim is without merit.

Identigene tested several areas – areas E, G, P, and V, of a beige sheet recovered from the scene of the instant capital murder and determined that the applicant could not be excluded as a contributor, with testing producing

23

probabilities such as 1 in 2.8 x 10$^{17}$, 1 in 1.4 x 10$^{16}$, and 1 in 6.6 x 10$^{13}$. *State's*

*Ex. A.* DNA testing results from the lab chosen by the applicant for post-

conviction testing, were similarly inculpatory, with the lab's report stating, in

part, the following:

> The primary donor of the epithelial cell DNA fractions from areas
> E, G, P and V is, in my opinion, Garcia Glen White . . . . The DNA
> from the sperm fractions of areas G and P (items 4 and 5)
> originated, in my opinion from Garcia Glen White . . . . The DNA
> from the sperm fraction areas E and V (items 3 and 6) is a
> mixture. The primary donor is, in my opinion, Garcia Glen White.

*State's Ex. B.*

The applicant's argument regarding the impact of the DNA retesting

results on trial counsel's strategy decisions is meritless. In its opinion

granting the State's motion for summary judgment and denying the applicant

federal habeas relief, the federal district court noted that the jury heard

testimony from the State's serological expert regarding a possible third DNA

donor. *White*, No. H-02-1805, 2011 WL 4625361, at *5. On cross-

examination at trial, HPD serologist Joseph Chu testified that there were

indications of another DNA contributor with regard to samples taken from

the beige sheet; that there was a letter in Chu's records stating that stains

from the beige sheet were compared to the DNA of G.L. Williams, and the

result was that it could possibly have come from a close relative of Williams;

and, that testing of a semen stain on a blue sheet not admitted into evidence revealed DNA that did not match the applicant's DNA (XVII S.F. at 388, 404-5). Therefore, the applicant's jury was aware that there was possibly another DNA contributor on the samples taken from the beige sheet, and trial counsel was free to raise the possibility of another individual's involvement in the primary offense based on such testimony.

Regardless, the DNA retesting results did not rule out the applicant's guilt, a point that the federal district court and Fifth Circuit noted in denying the applicant habeas relief and COA. *White*, 522 Fed. App'x at 233, 2013 WL 1442568, at *6; *White*, No. H-02-01805, 2011 WL 4625361, at *5. The federal district court remarked that the DNA retesting "unequivocally" proved that the applicant was present and ejaculated in his victims' apartment. *Id.* Further, such evidence was not newly presented in light of the trial testimony of HPD serologist Chu. *White*, 522 Fed. App'x. at 233.

Finally, the applicant relies on Article 11.073 of the Texas Code of Criminal Procedure in arguing that he is entitled to a new trial based on the retesting of DNA evidence in 2003 and 2004. *Applicant's writ at 15*. Article 11.073 applies to relevant scientific evidence that was not available to the defense at trial and contradicts scientific evidence relied on by the trial prosecutors. TEX. CODE CRIM. PROC. art. 11.073(a). As noted above, however,

the DNA retesting results did not contradict the prosecution's scientific evidence from trial, i.e., the trial testimony of HPD serologist Chu. Further, Article 11.073 does not provide the applicant with an additional basis for habeas relief because the applicant does not show by a preponderance of the evidence that he would not have been convicted if the DNA retest results had been presented at trial. *Compare with Ex parte Robbins*, No. WR-73,482-02, 2014 WL 6751684, at *8 (Tex. Crim. App. 2014)(holding that defendant entitled to habeas relief under Article 11.073 based on medical examiner's post-trial reconsideration of autopsy findings).

### -MITIGATION

Finally, the applicant's claim that he is entitled to habeas relief based on alleged newly discovered mitigation evidence does not meet the statutory requirements for filing a subsequent state application for writ of habeas corpus. *See* TEX. CODE CRIM. PROC. art. 11071, § 5. Specifically, the applicant refers to the 2015 report of neuropharmacologist Wilkie Wilson, Ph.D., which outlines the possible effects of cocaine and marijuana on the applicant at the time of the primary offense. *Applicant's writ at 15: Applicant's Appendix F*.

Notably, Dr. Wilson's opinions are based on nothing more than his review of the 2002 and 2008 reports of Drs. Silverman and Averill which the applicant previously presented to various courts throughout state and

federal habeas litigation.[6] *Applicant's Appendix F at 2*.  Dr. Wilson did not evaluate the applicant or review his medical records, much less review the trial record.  Moreover, Dr. Wilson's conclusions are entirely speculative.  Therefore, the applicant does not meet the statutory requirements for filing a subsequent state application for writ of habeas corpus with the instant claim.  *See* TEX. CODE CRIM. PROC. art. 11071, § 5.

Based on the foregoing, the applicant fails to meet the requirements of TEX. CODE CRIM. PROC. art. 11.071, § 5.  In the alternative, and notwithstanding the applicant's failure to meet the statutory requirements of art. 11071, § 5 for the filing of a subsequent application for writ of habeas corpus, the applicant's claims are meritless.

---

[6] The applicant referenced Drs. Silverman and Averill's reports in his state habeas applications filed in cause nos. 723847-B, C and D, as well as in federal habeas.

27

## IV. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Respondent respectfully requests that the Court of Criminal Appeals dismiss the applicant's instant subsequent application for writ of habeas corpus and/or deny the applicant habeas relief.

Respectfully submitted,

/s/LYNN HARDAWAY
LYNN HARDAWAY
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-6657
(713) 755-5240 fax
TBC 08948520
Hardaway_Lynn@dao.hctx.net

## V. CERTIFICATE OF SERVICE AND COMPLIANCE

Service has been accomplished by sending a copy of this instrument by

mail to counsel for the applicant on this the 22nd day of January, 2015.

Pat McCann
Attorney at Law
909 Texas Ave. #205
Houston, Texas 77007
713 223-3805
713 226-8097 fax
writlawyer@justice.com

Pursuant to TEX. R. APP. P. § 9.4, I certify that the instant document contains

6325 words.

Respectfully submitted,


/s/LYNN HARDAWAY
LYNN HARDAWAY
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-6657
(713) 755-5240 fax
TBC 08948520
Hardaway_Lynn@dao.hctx.net